**TRANSCON LINES, Plaintiff,**

v.

**A. G. BECKER INCORPORATED, A. G. Becker Holdings, Incorporated, AGB-WPB Incorporated, the Becker Warburg Paribas Group Incorporated, Warburg-Paribas, Inc., S. G. Warburg & Co., Ltd., Paribas International, Clinique Laboratories Inc., EJL Corporation, Estee Lauder, Joseph H. Lauder, Ronald S. Lauder Leonard A. Lauder, Jerry G. Rubenstein, Redstone Corporation, Alamo Express, Inc., and Alamo Cartage Co., Inc., Defendants.**

**No. 78 CIV 5513, (LBS).**

United States District Court,
S. D. New York.

March 15, 1979.

---

Wachtell, Lipton, Rosen & Katz, New York City, for plaintiff; Theodore Gewertz, Marc H. Rosenbaum, and Theodore N. Mirvis, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for defendants Jerry G. Rubenstein, Redstone Corporation, Alamo Express, Inc., and Alama Cartage Co., Inc.; Mel P. Barkan, and Dennis J. Block, New York City, of counsel.

Skadden, Arps, Slate, Meagher & Flom, New York City, for defendants A. G. Becker Incorporated, A. G. Becker Holdings, Incorporated, AGB–WPB Incorporated, the Becker Warburg Paribas Group Incorporated, Clinique Laboratories Inc., EJL Corporation, Estee Lauder, Joseph H. Lauder, Ronald S. Lauder, Leonard A. Lauder.

William P. Frank, Richard F. Hope, Robert W. Wien, New York City, and Randy Harris, Chicago, Ill., for A. G. Becker Holdings, the Becker Warburg Paribas Group Incorporated and AGB–WPB Incorporated.

## OPINION

SAND, District Judge.

Plaintiff, Transcon, Inc., seeks an order enjoining defendants from, *inter alia,* pur-

chasing any additional shares of Transcon stock and compelling defendants to divest themselves of the shares they have already purchased. Plaintiff alleges that defendants have failed to comply with the following statutes and regulations: § 13(d) of the Securities and Exchange Act, 15 U.S.C. § 78m(d) and Schedule 13D promulgated pursuant thereto, 17 C.F.R. § 240.13d-101, § 7 of that Act and the margin regulations promulgated pursuant thereto, 12 C.F.R. §§ 220.1 *et seq.* and 224.1 *et seq.*; and § 5 of the Interstate Commerce Act, 49 U.S.C. § 5.[1] On the basis of the findings of fact and conclusions of law set forth herein, we fail to find any of the violations alleged and deny plaintiff's claims for relief.

*PRIOR PROCEEDINGS HEREIN*

Plaintiff commenced this action on November 15, 1978, two days after the Schedule 13D was filed. Following expedited discovery, application was made for a temporary restraining order and a preliminary injunction enjoining defendants from, *inter alia,* purchasing any shares of Transcon stock. The parties reached an agreement with respect to certain procedures to be followed pending a determination of this action and, after argument on the motion for a preliminary injunction held on January 8, 1979, the parties accepted the Court's suggestion that trial of the action on ·the merits be consolidated with the hearing on the preliminary injunction. Trial was held on February 1 and 2, 1979.

*FINDINGS OF FACT*

In connection with its claims concerning § 13(d), plaintiff alleges that defendants failed to adequately disclose the full mem-

bership of a "group". This claim presents novel questions of law, as to which the parties have submitted extensive and very helpful briefs. It also involves difficult questions of fact concerning long-standing relationships among the parties and the nature of their meetings and interactions over a course of time. We therefore find it necessary to recount these relationships and interactions in somewhat greater detail than we might otherwise undertake.

Plaintiff is incorporated in California, and conducts its trucking operations in or through forty states. Its stock is registered and is listed and traded on the New York and Pacific Stock Exchanges. As of September 30, 1978, there were 3.1 million shares outstanding.

Defendants may be grouped as follows: A. G. Becker, Incorporated ("Becker"), A. G. Becker Holdings, Incorporated, AGB-WPB Incorporated, the Becker Warburg Paribas Group Incorporated ("BWP"), Warburg-Paribas, Inc., S. G. Warburg & Co., Ltd.,[2] and Paribas International, may be termed the "Becker defendants". All of the Becker defendants are Delaware corporations, with the exception of S. G. Warburg & Co., Ltd., a United Kingdom corporation, and Paribas International, a French societe anonyme. BWP is the ultimate holding company for Becker, and both Becker and BWP (as well as AGB-WPB and Becker Holdings) have offices at 55 Water Street, New York City.

Becker is, *inter alia,* a registered broker dealer in securities. Its principal activities include brokerage, specialist and equity trading, clearing and performance measurement services, the trading of credit securities and money market instruments, includ-

---

1. Subsequent to the trial of this action, Transcon filed with the ICC a Complaint, Petition and Memorandum seeking a cease and desist order against defendants Jerry G. Rubenstein, Redstone Corporation, Alamo Express, Inc., Alamo Cartage Co., Inc., A. G. Becker Incorporated, Clinique Laboratories, Inc. and EJL Corporation, and against IU International Corporation and Ira T. Wender, who are not defendants in this action.

In its Complaint in this proceeding, plaintiff also alleged common law claims, but those

claims have not been pressed and will be deemed to have been abandoned.

2. Defendants have entered into a Stipulation dated February 1, 1979, providing *inter alia,* that the claims against and the defenses of S. G. Warburg & Co., Ltd. will be tried in a separate and later trial pursuant to F.R.Civ.P. 42(b). In light of the findings and conclusions we reach in this opinion, such trial will not be necessary.

ing corporate and municipal bonds, commercial paper, bankers' acceptances, certificates of deposit and government securities, and the underwriting of municipal bonds.

Clinique Laboratories, Inc. ("Clinique"), EJL Corporation, Estee Lauder, Joseph H. Lauder, Ronald S. Lauder, and Leonard A. Lauder are the "Clinique defendants". Clinique is a New York corporation engaged in the business of manufacturing and distributing allergy-tested cosmetics. EJL Corporation is a Delaware corporation which is a "control person" of Clinique within the meaning of § 20 of the Securities and Exchange Act. The four individual Lauders are also control persons of Clinique.

The "Rubenstein defendants" include Jerry G. Rubenstein ("Rubenstein"), the Redstone Corporation ("Redstone"), Alamo Express, Inc. ("Alamo Express"), and Alamo Cartage Co., Inc. ("Alamo Cartage").

Rubenstein controls Redstone, Alamo Express and Alamo Cartage (collectively referred to as "Alamo"); he owns all of the voting stock of Redstone, which in turn wholly owns Alamo Express and Alamo Cartage. All three companies are incorporated in Texas. Alamo Express is an interstate trucking company. Alamo Cartage is a common carrier of freight.

Rubenstein has interests not only in the above-described trucking companies, but in a number of management companies as well. He owns all of the voting stock of Vanguard Enterprises, Inc. ("Vanguard"); he owns 85% of Omni Management, Inc. ("Omni"); he owns approximately 57% of Synectics Management, Inc. ("Synectics"); and he controls 60% of The Halcyon Company ("Halcyon"), a partnership of which Synectics owns 40% and Omni owns 20%.

At an earlier stage in his career, indeed for most of his working life, Rubenstein occupied various executive positions in large trucking concerns. By 1974, he was president of IU International, the parent corporation of a number of utilities and transportation companies, including two of the major interstate carriers, Ryder and PIE. He was also a member of its board of directors. Rubenstein left IU International in Novem-

ber of 1974, having decided that the large corporate business world no longer suited him and that he preferred "to do some things on my own."

In March, 1975, he was approached by the Sun Oil Company ("Sun") (now the Sun Company) to assist it in diversifying into the transportation and distribution fields. Vanguard was formed in June, 1975, to facilitate Rubenstein's dealings with Sun. Shortly after that, Rubenstein formed Synectics, in which he has a 57% interest. The other shareholders of Synectics are Ira T. Wender, now the President of BWP, and three of Rubenstein's business associates. Wender and the other three associates received their stock as compensation for services rendered in developing the business relationship with Sun. The Sun-Vanguard contract was renegotiated and Synectics is now also a party to it.

Pursuant to the Sun contract, Rubenstein (through Vanguard) agreed to locate suitable acquisition candidates for Sun. In return, Synectics has a percentage interest in the profits of any companies acquired through its recommendations for a five-year period. Sun has in fact acquired a number of companies through Synectics introductions.

In June, 1976, Rubenstein submitted to Sun (through Vanguard) a report on Transcon, recommending it is an acquisition candidate. The recommendation was not taken. He submitted a similar report to Alco Standard Corporation in March, 1977, which also rejected his recommendation.

On February 1, 1978, Wender became the President of BWP, as noted above. He also became the chief executive officer of Becker. Wender and Rubenstein have known one another since the late 1960's. In 1974, Wender was a director of IU International and Rubenstein was the corporation's president.

A short time prior to Wender's move to BWP, he and Rubenstein agreed to form a joint venture, between Rubenstein and BWP, for the purpose of acquiring operating companies in the distribution and trans-

portation fields. Halcyon was subsequently formed as the mechanism for acquiring the companies, and Omni was formed to provide management services for the companies to be acquired.

Shortly after the commencement of Wender's employment at BWP, Rubenstein submitted a new version of the earlier Synectics report on Transcon to BWP, again recommending Transcon as a possible acquisition.[3]

BWP was interested in acquiring Transcon. Wender circulated the Synectics report on Transcon within BWP, with a covering memorandum. Wender at that point anticipated an investment of $1.5 million by the BWP-Rubenstein partnership, with the remainder of the funding to be provided by a number of other investors, including possibly the Lauders, some shipping interests with whom Rubenstein was acquainted, and other Becker entities. The acquisition was at that time conceived of as a cash merger; Wender proposed to acquire 4.9% of the stock during the period March 15 to April 15, and then to begin negotiations for a cash merger by the end of April. He also, however, understood that there might be a "war" with the Transcon management. In any event, he had arranged for Rubenstein to speak with BWP's management and Executive Committees on March 2 and 3. Wender was one of the ten members of the Executive Committee, whose approval was required for an investment of the size contemplated.

Throughout February, March and April, Rubenstein and Becker continued to meet and discuss the Transcon deal. On February 23, Rubenstein met with Wender and David O. Wicks of BWP; On March 13, he attended a meeting at the offices of Skadden, Arps, Slate, Meagher & Flom, the law firm representing the Becker and Clinique defendants in this litigation, which firm Becker was to retain with respect to the acquisition of Transcon.

On April 3 and 5, Rubenstein met Sir Siegmund Warburg at the Becker offices. The subject of investing in Transcon was discussed at these meetings. Sir Siegmund Warburg is the founder of S. G. Warburg & Co., Ltd.; while he is not a shareholder or director of BWP or Becker, he does maintain an interest in the activities of those entities.

On April 26, 1978, David O. Wicks, of BWP, and Rubenstein met with representatives of two banks—Citibank and Continental Illinois National Bank—to discuss the possibility of bank loans to BWP for an acquisition of Transcon, including the possibility of either a cash merger or a tender offer. It was understood by the bank representatives that Rubenstein would play a role in the future management of Transcon, but the specifics of that role were not "spelled out". Rubenstein did mention certain management changes he would introduce. It was also understood that Rubenstein would have an equity interest in Transcon. At that point, Wicks and Rubenstein did not know whether the proposed acquisition of Transcon would be friendly or unfriendly, and the meeting ended with the understanding that BWP would approach Transcon management to ascertain its position. On April 27, Fradkin of Citibank phoned Wicks with the advice that Citibank would not participate in the financing if the Transcon acquisition were unfriendly. Subsequent to Wender's meeting with Transcon in May—to be discussed below—Wicks informed Fradkin that the acquisition would in fact be an unfriendly one.

Bruen, of Continental Illinois, inquired of Wicks on a number of subsequent occasions as to whether "there was anything further for us to do with regard to our discussion of April 26" and, receiving only negative re-

---

**3.** In the course of a conversation with Rubenstein in January, 1978, Sir Siegmund Warburg, founder of S. G. Warburg & Co., Ltd., advised Rubenstein that a European client might be interested in investing in an American Trucking company. Rubenstein states that he submitted the Synectics report to BWP as a result of that conversation, but that the European investor proved not to be interested. BWP, on the other hand, was interested. (Rubenstein affid. ¶¶ 8, 9).

362

plies, stopped inquiring.[4] Since the April 26 meeting, there have been no substantive discussions with Continental regarding Transcon.

Throughout these meetings, Rubenstein made sure that all participants in the discussions understood that he would be unable to join in the Transcon acquisition unless he first either divested himself of Alamo or obtained ICC approval for the transaction. As the owner of an ICC-regulated carrier, he was required by the provisions of the Interstate Commerce Act to do either of those things. This fact was raised at the meeting at Skadden, Arps' offices, and at the April 26 meeting with the bank representatives. Becker also understood this; Wender "anticipated" that Rubenstein would participate in the Transcon investment, but knew that unless Rubenstein sold Alamo he would be precluded from doing so because of "ICC problems". Wender did expect, based on his involvement in some of the negotiations for the sale, that Rubenstein would sell Alamo. In many internal Becker documents written during this stage of the transaction, however, it was stated that "Rubenstein-BWP", i. e., a partnership involving Rubenstein, would be involved in the Transcon acquisition.

On May 11, 1978, Wender met with Stephen Ackerman, Vice-President and Treasurer of Transcon. He proposed a negotiated acquisition of Transcon, at a non-specific price substantially above market and an incentive plan for existing management. Ackerman responded that he did not believe that Transcon would be interested in the proposal, but that he would advise Wender if there were any interest in further discussion.

On May 22, Ackerman phoned Wender and stated that Transcon had no interest in the proposal. In light of this circumstance, Becker considered the alternatives which included an unfriendly tender offer for 51% of the stock, and the making of a minority

investment. Becker believed that Rubenstein would be involved in whichever of these alternatives was followed; Wender expected that Rubenstein would "dispose of Alamo".

During the following month, Becker decided not to go ahead with an unfriendly tender offer but, rather, to acquire a minority interest in Transcon.

[Over the past 17 years, over 50% of BWP's profits have been derived from private investment activities, i. e., those in which the firm acted as a principal, using its own funds for its own account. In most of those investments, BWP held a minority position; in some, it has had a majority interest. BWP's minority interests have ranged from 7.5% to 30–40%, and have been in a variety of industries. It also has a 60% investment in a book distribution company. In the past year, BWP has acquired minority positions in two other companies besides Transcon.]

With respect to Transcon, draft investment brochures dated June 9, 1978 describe a 100% acquisition. New drafts prepared on June 16, however, delete the discussions of financial structure and bank financing, suggesting that Becker no longer planned a 100% acquisition. The second drafts also delete the original discussion of Wender's and Rubenstein's projected roles in the management of Transcon, which had been described in the June 9 draft as follows:

"*MANAGEMENT*

While BWP and its associates have not established a management strategy in terms of identifying changes in current Transcon management and possible new key personnel, two members of BWP and its associates have extensive experience in the trucking industry from operations, managerial and corporate director points of view. Ira T. Wender, President of BWP is a director of IU International

4. There was a degree of confusion in Mr. Bruen's files as to when these contacts occurred. A memorandum from his files places the date of the meeting with Rubenstein and Wicks as July of 1978, and the subsequent

inquiries as occurring between July and September. These dates are contradicted by Wicks (Affid. ¶¶ 3–7) and were corrected by Mr. Bruen at his deposition. (Bruen 72, 79).

which has a trucking division consisting of _____ . [sic] Jerry Rubenstein, formerly President of IU International owns a successful truck line in Texas and has had broad experience in Trucking as well as other industries (see Exhibit _____). [sic]"

"Messrs. Wender and Rubenstein would be intimately involved in Transcon as the management and operational changes are examined and implemented. However, their exact role as management and directors will depend on (1) in the case of Mr. Rubenstein the sale of his current truck line and (2) in the case of Mr. Wender, his resignation from the Board of IU, to comply with ICC regulations concerning ownership.

Further, it is anticipated that senior officers of BWP with extensive investment management skills and associates of Mr. Rubenstein with Trucking background will be actively involved in the future planning of Transcon."

On June 19, a meeting was held at the offices of Skadden, Arps, attended by Wender, Randy Harris, (Becker's General Counsel), Wicks, Marie McMahon (Wicks' assistant), Rubenstein, and three attorneys from the law firm. The various alternatives under consideration were discussed at the meeting, along with the legal ramifications and requirements pertinent to each. With respect to the acquisition of a minority interest, a proposal was discussed of first making open market purchases and then acquiring large blocks of stock from institutional holders.

The subject of Rubenstein's role in the proposed transaction was also discussed at the June 19 meeting. Again, Rubenstein stated that he could not participate unless he divested himself of Alamo. Rubenstein expressed some doubt at the meeting as to whether he would in fact be able to sell Alamo, given the progress of the negotiations. He did, however, believe that he could legally be a consultant to the investors, even if he could not himself invest.

On June 20, Wender, Wicks, and William Cockrun (Vice Chairman of BWP) had fur-

ther discussions regarding the form of the Transcon investment or acquisition, and it was decided not to make an unfriendly tender offer, whether for 100% or 51% of the shares.

On June 21, Wender met with Leonard Lauder, senior vice-president of Clinique Laboratories, Inc. and president of EJL Corporation. At that meeting, he gave Lauder a copy of the Synectics Report, the 1977 Annual Report of Transcon, and a cover memorandum which detailed a proposed acquisition of approximately 20% of Transcon's outstanding stock, with an investment of $7.5 million. It was estimated that 20% of the stock could be acquired for approximately $6.2 million. The memorandum also stated that BWP would invest $2.5 million, with the remaining $5 million to come from a single private investor. Finally, it was noted that the 20% figure was not definite, and that the actual amount to be purchased would be "sufficient stock to enable XYZ [the proposed investment vehicle] to discuss changing current business practices with present management of Transcon." It was anticipated that bank debt could be used to increase XYZ's stock ownership above the 20% range. BWP's investment would be made through Halcyon—the Synectics-Omni-BWP partnership that had been formed on July 1, as of February 1. It was thus contemplated at that time that Rubenstein would have an equity interest in the "XYZ" investment; this was Lauder's understanding, although he did not specifically understand that Rubenstein's participation was to be made through Halcyon.

At the end of the meeting, Lauder indicated that he would consider the investment while on vacation and would advise Wender upon his return in late July. He understood that any participation by Rubenstein was contingent on his disposing of Alamo.

Between the time of the Wender-Lauder meeting on June 21 and Lauder's return from vacation, Rubenstein's negotiations for the sale of Alamo did terminate, and he was definitely unable to participate in the

Transcon investment. These negotiations had been in progress throughout late 1977 and 1978. In large part, they were carried out by Jeffrey J. Collinson, senior vice president of J. Henry Schroder Corporation, a shareholder of Redstone and—as will be discussed below—for a time a participant in the Transcon investment.

In some cases, the negotiations during this period for the sale of Alamo were a renewal of previous discussions on that subject. In the early 1970's, Ronald E. Burbank of Consolidated Freightways had been in contact with Rubenstein, with respect to a purchase by Consolidated of Alamo's operating authority in certain parts of Texas; there had, in fact, been such contacts with Alamo's principals before its sale to Rubenstein. Discussions with Yellow Freight began in the late summer or fall of 1977. McLean Trucking Company had been interested in a possible acquisition of Alamo in late 1976 or early 1977.

During 1978, there was a short period which terminated in February, during which negotiations took place with Roadways Express, Inc. The principal negotiations were with Consolidated Freightways and Yellow Freight Systems, Inc. The negotiations with Consolidated began in May, 1977 and continued in a somewhat sporadic fashion until July of 1978.[5] Negotiations with Yellow Freight began in the late summer or fall of 1977, as noted above, and continued until May, 1978.

As of August 4, it became clear to Rubenstein that there was no prospect for future negotiations for the sale of Alamo, as the NLRB on that date ordered a collective bargaining union recognition election to be held at Alamo in October. The Teamster's Union subsequently won the October election. With one minor exception, there have been no negotiations for the sale of Alamo since late June of 1978, when Burbank of Consolidated Freight sent a letter to Collinson. The exception is an inquiry made to Banner Industries in November 1978; Banner was not interested in acquiring Alamo.

Lauder returned from vacation in late July or early August. During the first week in August, Wender was informed by Rubenstein that negotiations for the sale of Alamo had terminated, and that the union election had been ordered. At some point in early August, Lauder advised Wender that Clinique would go forward with the $5 million investment in Transcon.[6] A draft Memorandum of Understandings was prepared dated August 10, 1978.

The Memorandum of Understandings was executed by Clinique and Becker on August 31, 1978. It provides that Becker and Clinique must give one another a right of first refusal should either of them decide to sell their Transcon stock, unless Becker wishes to sell to Rubenstein or an entity affiliated with him. In that event, Becker may transfer up to 50% of its stock to Rubenstein or an affiliated entity. However, Becker may transfer up to 100% of its stock to an entity

---

**5.** Plaintiff challenges the *bona fides* of these negotiations past March of 1978 or shortly thereafter. Pl. Post-Trial Memo. at 72. While the facts as to the termination of negotiations with Consolidated are not unambiguous, we find that plaintiff has failed to sustain its burden of proof on the question.

We also reject plaintiff's contention that all negotiations for the sale of Alamo *in trust*, a necessary element of the transaction if Rubenstein were to be free of ICC restraint without delay, terminated by March or early April. Such negotiations with respect to a trust created by the *purchaser* do appear to have ended by that time; assuming a contract of sale were signed, however, Rubenstein believed that he could have placed Alamo in a liquidating trust and thereby cleared himself of ICC restraint.

While such a trust arrangement would have accomplished the same result vis-a-vis the ICC, it was less attractive to Rubenstein from a business point of view, as he would retain the risk of loss pending approval of a sale by the ICC.

**6.** Lauder testified that he understood by late August that Rubenstein would be unable to participate. (Lauder 127, 136–38). Wender testified that Lauder told him he would go ahead with the investment "in late July or during August." In light of the draft Memorandum of Understandings dated August 10, 1978, it appears that either Lauder decided to commit Clinique to the investment by August 10, or that a draft which does not include Rubenstein was prepared before Lauder's decision was made.

"of which Rubenstein or his affiliated entities owns no more than a 60% interest and the remaining interest is held, directly or indirectly, by Becker, Clinique, both of them or any affiliate of either of them." The Synectics-Omni-BWP partnership, Halcyon, appears to meet the latter requirement. Becker is under no obligation to transfer any shares to Rubenstein or any other entity, and Rubenstein at the present time (and at the time the Memorandum of Understandings was drafted and executed) is unable to acquire a substantial interest in Transcon, directly or indirectly. Wender has not discussed any term of a future sale, such as price or number of shares, with Rubenstein; it is Wender's understanding that he "couldn't" discuss such matters with Rubenstein, and that Rubenstein has never tried to have such a discussion with him.

Becker and Clinique began purchasing Transcon stock on September 15, 1978. Rubenstein remains in close contact with Wender with respect to Becker's and Clinique's purchases of Transcon stock, and until recently he received copies of the Becker internal reports on the progress of the purchase program including price and cumulative totals of purchases. Rubenstein has also made frequent phone calls to George E. Morris, Jr., the Becker employee in charge of actually making the purchases of Transcon stock. He does not, however, advise Morris regarding those purchases. Rubenstein's calls to Morris were made from the end of September to December.

During May and June, 1978, Wender met several times with Stephen R. Petschek, president of J. Henry Schroder Corporation. Petschek is a former client of Wender's, and a friend of both Wender and Rubenstein.

Wender, Rubenstein and Petschek and their families spent the weekend of September 22–24 in Vermont. During that weekend, or possibly during a weekend in June, Wender described to Petschek the Becker-Clinique investment in Transcon. Wender made it clear to Petschek that Schroder would have to invest at least $500,000. which was the maximum Petschek thought Schroder would invest.

On September 29, Petschek and Mark Magid (Petschek's superior at Schroder)' met with Wender and Rubenstein at the Knickerbocker Club in New York. Rubenstein was present at Schroder's request. The Transcon investment was explained to Magid, including the fact that Rubenstein could not participate.

It was also explained to Magid at the September 29 meeting that Schroder's investment would be subject to a 20% management override, i. e., that 20% of the shares Schroder purchased might at some point be utilized as an incentive device for Transcon management. Becker's shares were subject to the same condition, although Clinique's were not. The reason for this distinction, Wender testified, was that Clinique was to obtain a preferred interest having a limited profit participation.

Magid and Petschek discussed the possible investment in Transcon about 8–10 days following the Knickerbocker Club meeting, at which time Magid decided that Schroder would make the investment. At some point on or before October 16, Petschek called Wender and informed him of the decision. On October 16, Wender sent an interoffice memorandum to Wicks regarding Schroder's participation, which read in pertinent part as follows:

"Steve Petschek of Schroders called me to say they would like to join in the transaction. The plan is for them to put up $500,000 or 20% of our position. They would pay the same 2/3rd of the New York Stock Exchange commission as we and the Lauders. Their stock is also subject to the Omnicall."

Wender dictated this memorandum, but did not read it before he sent it to Wicks.

The term "Omnicall" may not have been transcribed as Wender intended it. Wender did not read the memorandum he had dictated. The term as dictated, and as Wender intended it, may have been "Omni-type call". Wender intended to refer to the management incentive stock arrangement discussed at the Knickerbocker Club meeting. The term "Omnicall" was not intended to refer to a call held by the Omni

corporation on Becker's Transcon stock. Omni does not have a call on such stock, and did not have a call at the time of the October 16 memorandum. Wender used the name "Omni" in his reference to the management incentive plan because a similar arrangement had been used in the formation of Omni as well as several other BWP investments. Thus, 15% of Omni's stock is held, for nominal consideration, by three of its management personnel (Sullivan, Lenz and Prashker). Wender referred to this arrangement as a "call", although it technically was not a call because the original shareholders in such arrangements were under no binding agreement to transfer the stock to key management employees at their request. Wender did not intend to suggest that the Omni Corporation was to be used as the management of Transcon in a takeover.

On October 18, Becker began purchasing Transcon stock for Schroder's account. Within a few days, however, Schroder decided to withdraw from the investment. Because of a lack of internal coordination within Schroder, another, conflicting, investment commitment had been made which took precedence over Transcon. Magid requested Petschek to inform Wender of the decision to withdraw, which Petschek did "probably a week or ten days" prior to November 2, i. e., between October 23 and October 26, when the bulk of Schroder's shares were sold.

On October 31, the combined shareholdings of Becker and Clinique exceeded 5% of Transcon's outstanding stock. On November 2, Becker sold 5,000 of Schroder's 6,700 shares. The Becker-Clinique Schedule 13D was filed with the SEC on November 13. Schroder's remaining 1,700 shares were sold on November 15. All of Schroder's shares were sold on the open market and were not purchased by Becker or Clinique. Schroder did not file a 13D and was not included as a member of the group on the Becker-Clinique 13D.

Becker and Clinique filed a Schedule 13D on November 13, as noted above. It provided as follows with respect to Rubenstein's involvement:

"In accordance with the Memorandum of Understandings [attached as an exhibit], Becker expects to sell or dispose of a substantial portion of its interest in the Company [Transcon] to Jerry G. Rubenstein * or an entity affiliated with him (although there is no legal obligation on the part of Becker or Rubenstein to enter into such a transaction) at such time, if any, as Mr. Rubenstein or such affiliated entity can acquire such interest in compliance with all applicable laws (including obtaining any necessary approvals from the Interstate Commerce Commission). Prior to purchasing their shares Becker and Clinique consulted Mr. Rubenstein, and they intend to continue consulting him, concerning their investment in the Company."

The asterisk following Rubenstein's name signalled the following footnote:

" * Mr. Rubenstein has informed Becker that his present principal occupation is President of Vanguard Enterprises, Inc., Ardmore, Pennsylvania, a firm of investment and management consultants specializing in the distribution and transportation industries. Mr. Rubenstein has indicated to Becker that he is the President and beneficial owner of all of the shares of voting stock of Redstone Corporation, a Texas corporation located in Houston, Texas, which wholly owns Alamo Express, Inc., and Alamo Cartage Co., Inc., San Antonio, Texas, both of which are authorized interstate and intrastate carriers operating only within the State of Texas. Mr. Rubenstein also indicated that he is President of both such companies."

As has already been discussed, the Memorandum of Understandings provides as follows with respect to Rubenstein:

"3. Except as provided herein, neither Becker nor Clinique will sell, transfer, assign or encumber its Shares to any third party. No entity affiliated with Becker, Clinique or both of them shall be deemed a third party. In the event that either party desires to sell any or all of its

Shares to any third party, the other party shall have a right of first refusal as to the Shares proposed to be sold, which will operate as follows: . . . "

"6. As soon as can be practicably accomplished in compliance with applicable law, Becker and Clinique each intend to cause their respective Shares to be transferred into a corporation (the "Corporation") which will be capitalized as follows: two-thirds (⅔) of the equity will consist of shares of a class of voting common stock and the remaining one-third of the equity will consist of shares of a class of voting stock senior to the common stock (collectively, the "Corporation Stock"). In exchange for their respective Shares, Becker and Clinique shall each receive one-half of the shares of common stock and Clinique shall receive all of the shares of senior stock. At such time as this exchange is accomplished, the right of first refusal set forth in subparagraph (a) of paragraph 3 will apply to the Corporation Stock.

"7. Notwithstanding anything contained in paragraphs 3 and 6 to the contrary, Becker may sell, exchange, assign, transfer or otherwise dispose of (a) not more than one-half of, (i) its Shares or (ii) its Corporation Stock, to Jerry G. Rubenstein, 223 Glenmoor Road, Gladwyne, Pennsylvania 19035 ("Rubenstein"), or entities controlled by him or (b) any amount of, (i) its Shares or (ii) its Corporation Stock, to any entity or entities of which Rubenstein or his affiliated entities own no more than a 60% interest and the remaining interest is held, directly or indirectly, by Becker, Clinique, both of them or any affiliate of either of them. To the extent that any Shares are disposed of by Becker to Rubenstein and related entities, Becker's interest in the Corporation Stock shall be proportionately reduced. If Rubenstein and related entities have not acquired the maximum amount of Shares from Becker permitted by this paragraph prior to the organization of the Corporation, then Becker may sell, exchange, assign, transfer or dispose of to Rubenstein and related entities such

portion of the Becker Corporation Stock in relation to the additional Shares that Rubenstein and related entities would have been permitted to acquire. Prior to any transfer of Shares or interest in the Corporation Stock to Rubenstein and related entities by Becker, it is understood that Rubenstein and such entities would adopt the understandings set forth in this Memorandum, as amended to include them, and would undertake to participate in the Corporation (if any is formed) by exchanging Shares for shares of common stock of the Corporation."

Rubenstein did not consult with Becker or Clinique with respect to the drafting of the 13D, except insofar as Becker requested him to provide information contained in the footnote.

Since the commencement of Becker's and Clinique's stock purchases, Rubenstein has kept in close communication with Becker through Wender and Morris regarding those purchases. He has received regular internal Becker reports of purchases and from late September until December, he called Morris two or three times per week.

With respect to Becker's and Clinique's purpose in purchasing Transcon shares, the Schedule 13D provided as follows:

"*Item 4. Purpose of Transaction*

Becker and Clinique have purchased Shares in accordance with a Memorandum of Understandings between them dated August 31, 1978 (the "Memorandum of Understandings") attached hereto as Exhibit II in connection with their purpose of acquiring a significant equity ownership position in the Company. Consistent with such purpose, Becker and Clinique intend, subject to the factors stated in the following paragraph, to continue to buy additional Shares from time to time in brokerage transactions on the open market or in privately negotiated transactions, if appropriate opportunities to do so are available, on such terms and at such times as Becker and Clinique consider desirable. Clinique has acted and intends to continue to act in conjunction

with Becker with respect to their respective investments in the Company and in deciding what future action either or both of them should undertake with respect to their interests.

Although the Memorandum of Understandings provides, among other things, that Becker and Clinique will expend from time to time funds in an aggregate of $7.5 million to purchase Shares (including those described herein), and Becker and Clinique intend to make purchases totalling such amount, Becker and Clinique also intend to review continuously their position in the Company, and may, depending upon their evaluation of the Company's business and prospects and upon future developments (including, but not limited to, the attitude of the Board of Directors and management of the Company towards the purchases of the Shares by Becker and Clinique), determine to invest more or less than an aggregate of $7.5 million in Shares (and to modify their understandings accordingly) and to increase or decrease or dispose of their position in the Company. In making any such determination, Becker and Clinique also intend to take into consideration other business opportunities available to each of them, developments with respect to the business of each, general economic conditions and money and stock market conditions.

In April 1978 the President of BWP contacted Allan B. Foy, President of the Company and in May 1978 representatives of BWP met with Stephen E. Ackerman, Senior Vice President and Treasurer of the Company, to explore BWP's possible interest in assembling a group of private investors (including BWP or an affiliate) to acquire the Company. Such an acquisition could have enabled the Company to terminate its registration and reporting obligations under the 1934 Act and could have resulted in termination of the Company's stock exchange listings. Mr. Ackerman indicated that, after reviewing the matter with other members of the Company management, such management had no interest at that time in pursuing any such discussions. No such further discussions have been held.

Becker and Clinique have considered the possibility of seeking control of the Company. However, at the time they purchased their Shares they did not (and they do not currently) have any plans to acquire control of the Company, make a tender or exchange offer for Shares, or propose a merger or other form of business combination involving Becker or Clinique and the Company. In addition, although Becker and Clinique may seek representation on the Company's Board of Directors, neither Becker nor Clinique has reached any conclusion as to whether to seek such representation. Representatives of Becker, Clinique or both of them may seek to discuss the business and policies of the Company with management from time to time."

### CONCLUSIONS OF LAW

I. *Rubenstein's Alleged Violation of Section 13(d)*

■ Plaintiff alleges that defendant Rubenstein violated Section 13(d) by failing to file a Schedule 13D with the SEC as a member of the Becker-Clinique group. Section 13(d) provides in pertinent part as follows:

(d)(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security . . . is directly or indirectly the beneficial owner of more than 5 per centum of such class [of securities] shall, within ten days after such acquisition, send to the issuer of the security . . . , send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors—

(A) the background, and identity, residence, and citizenship of, and the nature

of such beneficial ownership by, such person and all other persons by whom or on whose behalf the purchases have been or are to be effected;

(B) the source and amount of the funds or other consideration used or to be used in making the purchases . . . ;

(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the background, identity, residence, and citizenship of each such associate; and

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

The term "person" is in turn defined to include the following:

(3) When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection.

It is conceded that Becker and Clinique constitute a group for purposes of Section 13(d), and that they filed a Schedule 13D when their aggregated purchases of Transcon stock reached the 5% level.

Plaintiff appears to base its contention that Rubenstein is a member of the group on two grounds: first, plaintiff alleges that Rubenstein is presently a beneficial owner of Transcon stock by virtue of a "call" held by Omni on the stock purchased by Becker; second, plaintiff takes the position that even if Rubenstein is not a beneficial owner of Transcon stock, such beneficial ownership is not a necessary element of group membership, and that Rubenstein has so conducted himself with respect to this transaction as to be subject to the requirements of Section 13(d).[7]

### 1. *Rubenstein's Beneficial Ownership of Transcon Stock*

Transcon asserts that Rubenstein, through Omni, has what is "in substance" or "in reality" a call upon the shares purchased by Becker. We find this not to be the fact.

Plaintiff's argument in support of its contention is as follows: Rubenstein acted as a "finder" in bringing Transcon to Becker's attention; acted as a consultant with respect to the trucking industry in general and Transcon in particular; provided other assistance to Becker in arranging for financing and in enlisting Schroder as a participant. Rubenstein is also to provide management advice and oversee the management of Transcon in the future. Ruben-

---

**7.** Instruction (C) to the Schedule 13D requires that the information called for also be filed by any "person controlling" a member of a group. 17 C.F.R. § 240.13d–101. "Control" *is defined as*

> the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.

17 C.F.R. § 240.12B–2(f), made applicable to Section 13(d) by § 240.12b–1.

Although plaintiff characterizes Rubenstein as "the leader" of the group, as its "driving force", and as "spearheading" defendants' activities, there is no allegation that Rubenstein in fact controls either Becker or Clinique, nor does it appear that any such allegation could validly be asserted.

stein is entitled to compensation for these services, and has not yet received any compensation;[8] such compensation will be made in Transcon stock; Rubenstein must conceal his acquisition of a stock interest in Transcon because of the ICC rules. Rubenstein and Wender have such a close relationship that "there exists between [them] a hospitable climate for the existence of a friendly handshake or 'wink of the eye' understanding or arrangement with respect to Transcon stock"; Rubenstein and Wender have an agreement that Rubenstein will acquire up to half of Becker's shares either individually or through one of his affiliated entities, or that Halcyon will acquire all of Becker's shares, with Rubenstein having a 60% interest in Halcyon; this agreement constitutes a "call" upon Becker's shares.

"Beneficial ownership" is defined for purposes of Section 13(d) in Rule 13d–3:

(a) For the purposes of section 13(d) . . of the Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:

(1) *Voting Power* which includes the power to vote, or to direct the voting of, such security; and/or

(2) *Investment power* which includes the power to dispose, or to direct the disposition, of such security.

. . .

(d) Notwithstanding the provisions of paragraphs (a) and (c) of this rule:

(1)(i) A person shall be deemed to be the beneficial owner of a security . .

if that person has the right to acquire beneficial ownership of such security, as defined in Rule 13d–3(a) . . . within sixty days, including but not limited to any right to acquire: (A) through the exercise of any option, warrant or right . . . .[9]

There is no contention that Rubenstein presently has or participates in the exercise of either voting power or investment power with respect to any Transcon shares. Rather, plaintiff's claim is that Rubenstein has "the right to acquire beneficial ownership . . . ." within the meaning of Rule 13d–3(d)(1). By the terms of the Rule, any such "right to acquire beneficial ownership" must be exercisable within sixty days.[10]

We find that Rubenstein does not have "beneficial ownership" as that term is defined for these purposes. We find that, at the most, Rubenstein worked closely with Wender and Becker in developing the Transcon investment, and that he and Wender have a close personal and professional relationship such that he has a reasonable expectation of being treated "fairly" if there should come a time when he is free to acquire Transcon stock; that is, that Becker would, if he so requested, transfer a part of its shares to him at a reasonable price. Such an expectation as to the likely course of Becker's future conduct does not rise to the level of a "right to acquire" any shares from Becker.

Moreover, even if Rubenstein did have a "right" to acquire any of Becker's Transcon shares, any such acquisition is contingent upon his first disposing of Alamo or obtain-

---

**8.** Rubenstein has testified, however, that he does not consider himself to be entitled to a finder's fee or any other compensation by virtue of the role he played in presenting the Transcon investment opportunity to BWP.

**9.** 17 C.F.R. § 240.13d–3 (1978), *as amended by* SEC Exchange Act Release No. 14692, 43 F.R. 18484, 18496–97 (April 28, 1978, effective May 30, 1978), [1978 Transfer Binder] CCH Fed.Sec. L.Rep. ¶ 81,571. [Emphasis added]

**10.** However, "any person who acquires a security or power specified in paragraphs (A), (B), or (C), above, with the purpose or effect of changing or influencing the control of the is-

suer, or in connection with or as a participant in any transaction having such purpose or effect, immediately upon such acquisition shall be deemed to be the beneficial owner of the securities which may be acquired through the exercise or conversion of such security or power." *Id.* We find that Rubenstein did not acquire a right with respect to any Transcon shares; therefore, we need not inquire as to what the purpose or effect of such an acquisition might have been, or whether it was "in connection with or as a participant in" a transaction having the purpose or effect of changing or influencing the control of Transcon.

ing ICC approval for the acquisition. Plaintiff does not contend that Rubenstein will exercise any such right prior to that time; plaintiff characterizes the purpose of the Memorandum of Understandings as, in large part, "to recognize Rubenstein's interest without having the shares of Transcon actually held in his name or in the name of any of his affiliated entities and to facilitate the actual transfer of the shares to his controlled entity Halcyon when Rubenstein was no longer regarded as an ICC carrier."

Thus, even if Rubenstein has a right to acquire the stock, his exercise of that right is conceded to be contingent upon a future event. We find no evidence in the record before us as to when that event might take place, and it appears that Alamo's marketability decreased substantially in October of 1978, when the Teamsters Union won an election at the company.

Although not directly on point, *Nicholson File Co. v. H. K. Porter Company*, 341 F.Supp. 508 (D.R.I.1972) involved an analogous situation. Plaintiff sought to enjoin defendants from acquiring any shares of its stock and from soliciting or voting any proxies, alleging violations of Section 13(d)(1). At issue was whether defendants had the intent or an agreement to acquire control of the plaintiff at a particular time. The court noted that defendant Porter was aware that it would be in violation of the antitrust laws if it acquired plaintiff without first divesting itself of a subsidiary, and found that Porter "was in no position to 'agree' to acquire Nicholson until it could reasonably forecast the success of divestiture of Disston both for antitrust and financial reasons." *Id.* at 519. Similarly, we find that Rubenstein was in no position to agree to invest in Transcon until he could reasonably forecast the success of his efforts to divest himself of Alamo, and there is no evidence before us that he is in such a position today.[11] In making this determination, we are aware of the provisions of Rule 13d–3(b):

Any person who, directly or indirectly creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose or effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) . . . of the Act shall be deemed to be the beneficial owner of such security.

We do not find the existence of any arrangement to prevent the vesting of beneficial ownership in Rubenstein.

### 2. Rubenstein's Participation in the Group's Activities

Plaintiff also contends that beneficial ownership is not a necessary element of group membership. "[T]here simply is no requirement in law or logic that each member of a Section 13(d) group own (beneficially or otherwise) shares of the subject company, so long as others in the group with whom such member has agreed to act 'for the purpose of acquiring [or] holding . . . securities of an issuer' . . . acquire or hold the requisite amount of securities." (Pl. Post-Trial Reply Memo. at 8; Proposed Conclusion of Law # 8).

The issue appears to be one of first impression. We conclude that this case is not controlled by any prior decisions despite defendants' reference to a number of cases in which parties who played the *roles of* "advisors" to stock purchasers were found not to be members of groups with those stockholders. In each such case, however, the court's holding was based on a finding that plaintiff had failed to prove the requisite agreement, not on a conclusion that persons playing such roles could not as a matter of law be deemed to be group members. *Copperweld Corp. v. Imetal*, 403 F.Supp. 579, 598 (W.D.Pa.1975) (investment consultant whose subsidiary indirectly held

---

11. In light of our conclusion that Rubenstein does not have a right to acquire any Transcon stock, we do not reach the question of whether he may, under ICC rules, acquire less than a

"control" interest in Transcon as that term is defined by the ICC, while retaining his Alamo interest.

shares of subject corporation); *Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207, 217 (2d Cir. 1973) (broker who indirectly held shares); *National Home Products, Inc. v. Gray*, 416 F.Supp. 1293 (D.Del.1976) (brokerage firm with "nominal investment", firm's partners some of whom held shares individually); *Twin Fair, Inc. v. Reger*, 394 F.Supp. 156, 161 (W.D.N.Y.1975) (broker holding no shares). As indicated, in some cases the defendant broker or advisor also held shares of the subject corporation, and those cases in any event, of course, did not involve the factual context before this Court.

Defendants also cite a number of cases which suggest that beneficial ownership is at least a significant factor in determining whether an alleged group membership exists. Again, in none of these cases did the court hold that it is an essential element of group membership. Rather, in considering that fact, among others, the courts failed to find the existence of the requisite agreement to act as a group within the meaning of Section 13(d)(3). *Texasgulf, Inc. v. Canada Development Corp.*, 366 F.Supp. 374, 403–04 (S.D.Tex.1973); *Applied Digital Data Systems, Inc. v. Milgo Electronic Corporation*, 425 F.Supp. 1145, 1161 n.58 (S.D. N.Y.1977); *National Home Products, Inc. v. Gray*, 416 F.Supp. 1293–1323 and n.36 (D.Del.1976). Defendants also refer us to *Universal Container Corp. v. Horwitz*, [1977–1978 Transfer Binder] CCH Fed.Sec. L.Rep. ¶ 96,161, at 92,253–54 (S.D.N.Y. 1977); in that case, however, the issue before the court was the time at which defendants, who each held beneficial ownership of the issuer's stock, formed their agreement to take control of the corporation.

For its part, plaintiff cites a number of cases as standing for the proposition that "[a] Section 13(d)(3) 'group' is formed whenever two or more persons agree to act together with respect to the issuer's securities." While each of the cited cases contains language to that effect, in each of them the court found that the alleged group members all held beneficial ownership of the corporations stock, or the holding concerned

the existence of the requisite agreement, the time at which the agreement was made, or the truthfulness of the Schedule 13D. *GAF Corporation v. Milstein*, 453 F.2d 709, 717–18 (2d Cir. 1971), *cert. denied* 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); *Securities and Exchange Commission v. Savoy Industries, Inc.*, [Current] CCH Fed.Sec. L.Rep. ¶ 96,497, at 93,869–70 (D.D.C.1978); *General Aircraft Corp. v. Lampert*, 556 F.2d 90, 95 (1st Cir. 1977); *Jewelcor, Inc. v. Pearlman*, 397 F.Supp. 221, 250 (S.D.N.Y. 1975) (no findings made as to holdings of certain persons).

Plaintiff also cites the recent case of *Financial General Bankshares Inc. v. Lance*, [Current] CCH Fed.Sec.L.Rep. ¶ 96.403 (D.D.C.1978), and asserts that two of the defendants therein owned no shares of the issuer, but were still held to be members of the group. Those defendants were a foreign bank ("BCCI") and its president ("Abedi"). The court found that two of the purchasing defendants had given BCCI "extremely broad authority . . . to act on their behalf in regard to the FG stock purchased by them", that such authorization was given for the purpose of enabling BCCI to vote the stock acquired on behalf of the purchasers; *i. e.*, to act for them with respect to the holding of the FG shares, and thus to vote the defendants' stock as a block. *Id.* at 93,423 and 93,426 and n.32. The *Lance* court made no express findings as to the basis for its inclusion of BCCI and Abedi in the group. We conclude that BCCI was included because it had voting power over the stock, *i. e.*, beneficial ownership within the meaning of Rule 13d–3(a)(1), and that Abedi was included for the same reason, based either on the authorization held by BCCI or because Abedi independently held a similar authorization (although the court made no express finding of such a fact). Insofar as this proceeding is concerned, we conclude that the *Lance* court did not address the issue before us.

█ Not only is there no controlling precedent on the issue before us but the question is one not clearly answered by the

language of the statute or the rules. One may therefore state, as plaintiff does, that there is no *requirement* that all members of a group own shares of the subject company. Nevertheless, we believe that, in light of the purpose of Section 13(d) as evidenced by the legislative history and as interpreted by other courts in analogous cases, the better rule is that one who is not the beneficial owner of any shares of the subject company is not a member of a group within the meaning of Section 13(d)(3).

The Williams Act, of which Section 13(d) is a part, was enacted in 1968 as a measure to "close a loophole" in the Securities and Exchange Act:

> The bill would correct the current gap in our securities laws by amending the Securities Exchange Act of 1934 to provide for full disclosure in connection with cash tender offers and other techniques for accumulating large blocks of equity securities of publicly held companies. Under this bill, the material facts concerning the identity, background, and plans of the person or group making a tender offer or acquiring a substantial amount of securities would be disclosed.

H.R.Rep.No.1711, 90th Cong.2d Sess. (1968), reprinted in [1968] U.S.Code Cong. & Admin.News, pp. 2811, 2814.

The purpose of Section 13(d)(3), as the Report explained, was to "prevent a group of persons who seek to pool their voting or other interests in the securities of an issuer from evading the provisions of the statute because no one individual owns more than 10 percent [now 5 percent] of the securities."

> The group would be deemed to have become the beneficial owner, directly or indirectly, of more than 10 percent of a class of securities at the time they agreed to act in concert. Consequently, the group would be required to file the information called for in section 13(d)(1) within 10 days after they agree to act together, whether or not any member of the group had acquired any securities at that time. This provision is designed to obtain full disclosure of the identity of any per-

son or group obtaining the benefits of ownership of securities by reason of any contract, understanding, relationship, agreement or other arrangement.

*Id.* at 2818. In their memoranda to the Court, both plaintiff and the defendants have excerpted those portions of this passage which they deem to support their respective interpretations of Section 13(d)(3). Like the statute itself, however, the congressional commentary does not provide clear guidance as to the question before us: whether a person who has no beneficial ownership of a security may still be included within a group together with persons who do have such beneficial ownership.

The problem to which Section 13(d)(3) is addressed is exemplified in the case of *Financial General Bankshares, Inc. v. Lance, supra.* Over the course of approximately six weeks, four of the defendant investors acquired nearly twenty percent of plaintiff's shares; each defendant, however, purchased slightly less than five percent, and in the absence of Section 13(d)(3) there would have been no required disclosure of these purchases, and of the substantial change in corporate control they heralded.

Section 13(d) thus protects shareholders and the investing public against undisclosed, surprise shifts in corporate control:

> The history and language of section 13(d) make it clear that the statute was primarily concerned with disclosure of *potential changes* in control resulting from new aggregations of stockholdings . . . (Emphasis in original).

*GAF v. Milstein*, 453 F.2d 709, 718 (2d Cir. 1971). The disclosure it requires is intended "to alert investors to potential changes in corporate control so that they could properly evaluate the company in which they had invested or were investing." *Id.* at 720.

In considering whether Congress intended that persons not holding any beneficial ownership of the "target" corporation's shares should be included in a 13(d)(3) group, we must also consider the disclosure required of those who do file as a group. Item 6 of Schedule 13D requires that persons filing

[d]escribe any contracts, arrangements, understandings or relationships (legal or otherwise) among the persons named in Item 2 [the persons filing] and between such persons and any person with respect to any securities of the issuer, including but not limited to transfer or voting of any of the securities, finder's fees, joint ventures, loan or option arrangements, puts or calls, guarantees of loans, guaranties against loss, or guaranties of profits or divisions of profits or loss, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, understandings or relationships have been entered into. Include such information for any of the securities that are pledged or otherwise subject to a contingency the occurrence of which would give another person voting power or investment power over such securities except that disclosure of standard default and similar provisions contained in loan agreements need not be included.[12]

Thus, Item 6 requires the disclosure in the broadest terms of any arrangements or contracts with respect to the issuer's securities. The fact that such a relationship exists, however, does not of itself make all parties to it members of a group. Schedule 13D maintains a distinction between persons having beneficial ownership—who must file—and those who have some other interest—which persons and their interest must be disclosed.

Moreover, we note that the definition of beneficial ownership does not extend to the power to dispose or to direct the disposition of income or profits derived from the securities in question. Under Item 5, "Interest in Securities of the Issuer", the person filing a Schedule 13D is directed that

(d) If any other person is known to have the right to receive or the power to direct the receipt of dividends from, or the proceeds from the sale of, such securities, a statement to that effect should be included in response to this item and, if such interest relates to more than five percent of the class, such person should be identified.[13]

Such a person must be identified, but his economic interest in the proceeds or dividends from the securities does not require him to file as a beneficial owner or make him a member of a group filing as beneficial owner. Again, it appears that the thrust of Schedule 13D is to obtain detailed information about those who have acquired voting control or investment control; the disposition of the proceeds is of lesser significance.[14]

We conclude from our reading of Schedule 13D, Section 13(d), its legislative history and the regulations promulgated pursuant to it, that Congress and the SEC were concerned about changes in beneficial ownership, since such changes could quickly lead to changes in corporate control. As to persons acquiring beneficial ownership, shareholders and the investing public need detailed information. As to other persons who have a relationship to the securities, however, only their identities and the nature of the relationship need be disclosed.

We hold that defendant Rubenstein, having no beneficial ownership of Transcon securities, was under no obligation to file a Schedule 13D as a member of a group together with Becker and Clinique.

■ Even if we were to conclude that plaintiff's position is correct and that no beneficial ownership is necessary in order to find that Rubenstein was a member of the group, plaintiff still would have the burden of demonstrating that Rubenstein acted in concert with Becker and Clinique for the purpose of acquiring or holding the issuer's securities, within the meaning of Section 13(d)(3). We find that plaintiff has failed to sustain this burden.

12. *Id.* § 240.13d–101, Item 6.

13. *Id.* Item 5.

14. *See* SEC Exchange Act Release No. 13291 (February 1977) [1976–1977 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 80,980, at 87,585 (proposal that "beneficial ownership" include power to direct the receipt of dividends or proceeds from sale of securities not adopted by SEC).

Rubenstein has no present economic interest in any Transcon stock, whether through beneficial ownership or any other arrangement. He has in the past rendered considerable assistance to Becker and Clinique in providing analyses of Transcon and the trucking industry, and in discussing Transcon with the two banks and with Schroder; he believed that Transcon was an attractive investment and hoped that Becker and Clinique would acquire a sufficient share of the corporation's stock to enable them to influence its management; and he may acquire, at some indefinite point in the future, some of Becker's Transcon shares. Rubenstein testified—and we find the testimony to be credible—that he was not aware of the contents of the 13D filing made by Becker and Clinique except for the biographical footnote, nor was he aware of the contents of the Memorandum of Understandings.

We conclude that Rubenstein did not agree to act in concert with Becker and Clinique "for the purpose of acquiring or holding" Transcon shares. As stated in the legislative history of Section 13(d)(3), what is sought is a "common purpose", a "pooling of interests". "Mere relationship, among persons or entities, whether family, personal or business, is insufficient to create the group which is deemed to be a statutory person." *Texasgulf, Inc. v. Canada Development Corporation*, 366 F.Supp. 374, 403 (S.D.Tex.1973). Inasmuch as we find that Rubenstein distinctly and expressly did not seek to acquire Transcon stock, he did not have, in common with Becker and Clinique, a purpose of acquiring or holding plaintiff's stock.

In reaching this conclusion, we are mindful of the very serious consequences which would be visited upon Rubenstein were he to be deemed a member of the group; not only would he be subject to whatever penalties might arise for violation of Section 13(d) but calamitous adverse consequences would result vis-a-vis the ICC. One must proceed with great caution whenever it is suggested that the acts and statements of others impose upon a third party, without his explicit consent, such serious consequences.

We also are mindful of the potential reach of a rule that one having no economic interest in the acquisitions of others, whether through beneficial ownership or otherwise, may yet be held to be a member of a group by virtue of his participation in, and assistance to, their venture. Such acquisitions necessarily involve the services of a number of professionals: investment bankers, attorneys, proxy solicitation firms, *et alia*. Their "interest" in seeing an acquisition of shares proceed was not, we take it, within the scope of Congress' concern when it enacted Section 13(d)(3).

## II. *Alleged Violations of Rule 13(d) by Becker and Clinique*

Plaintiff alleges that the Schedule 13D filed by Becker and Clinique was misleading and omitted to state material facts with respect to the following three Items: (1) Item 2—defendants failed to disclose the membership of Schroder in the group; (2) Item 4—defendants' characterization of the purpose of the transaction was materially misleading in that it disclaimed their purpose of acquiring control of the issuer and failed to disclose defendants' plans to make major changes in its management; (3) Item 6—defendants failed to disclose the true understanding between Becker and Rubenstein with respect to the Transcon shares acquired by Becker.

## A. *The Membership of Schroder in the Becker-Clinique Group*

As described above, Schroder was briefly involved in the Transcon investment. By October 26, however, it sought to withdraw and notified Wender of that decision. The question before us is whether such notification effectively ended Schroder's participation; if it did not, then Schroder technically remained a member of the Becker-Clinique group until November 15, by which date all of its shares had been sold. It is conceded that Schroder did not file a Schedule 13D as a member of the group and that the Becker-Clinique Schedule 13D did not disclose Schroder's participation.

■ The parties have referred us to no authority with respect to the effect of an intended withdrawal when the purchaser continues to hold the shares in question. We also have found none. Assuming, however, that Schroder was a member of the group when the filing obligation arose on October 31 and when the Schedule 13D actually was filed on November 13, we conclude that any violation arising by virtue of such membership was merely technical and inadvertent, and such transitory membership was not a material fact which defendants were required to disclose.

■ In order for a fact to be material, there must be a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). On the facts here, we find that there does not exist a substantial likelihood that a reasonable investor would consider it important that Schroder was for a few days a participant in the Becker-Clinique investment in Transcon and decided, for reasons entirely internal to Schroder, not to pursue that investment.

■ Moreover, assuming that such fact was material and that the failure to disclose it was a violation of Section 13(d), plaintiff has not demonstrated the propriety of injunctive relief in connection with such a violation. A private litigant is not entitled to injunctive relief in the absence of a showing of irreparable harm. *Rondeau v. Mosinee Paper Corp.*, 442 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). Plaintiff has failed to establish such harm flowing from the failure to disclose Schroder's participation.

B. *"Control" Purpose and Planned Management Changes*

Item 4 of the Schedule 13D requires the person filing the statement to

[s]tate the purpose or purposes of the acquisition of securities of the issuer. Describe any plans or proposals which the reporting persons may have which relate to or would result in:

. . . . .

(a) The acquisition by any person of additional securities of the issuer, or the disposition of securities of the issuer;

. . . . .

(d) Any change in the present board of directors or management of the issuer, including any plans or proposals to change the number or term of directors or fill any existing vacancies on the board;

. . . . .

(f) Any material change in the issuer's business or corporate structure;

. . . . .

(j) Any action similar to any of those enumerated above.[15]

Plaintiff contends that the Becker-Clinique Schedule 13D, as set forth in pertinent part *supra,* fails to comply with this direction.

■ As one court recently has noted, "the degree of specificity with which future plans must be detailed in Schedule 13D filings presents a difficult question." *S–G Securities, Inc. v. Fuqua Investment Co.*, 466 F.Supp. 1114 (D.Mass.1978). Certainly, if defendants had firm plans to acquire control of Transcon or to make major changes in its management, business or corporate structure, those plans should have been disclosed. In determining whether or not defendants had such plans, we are, of course, not "blind to commercial realities". *Graphic Sciences, Inc. v. International Mogul Mines, Ltd.*, 397 F.Supp. 112, 126 (D.D.C. 1974). We have been cautioned, however, that "[i]t would be as serious an infringement of these regulations to overstate the definiteness of the plans as to understate them." *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir. 1969) (tender offer context).

---

**15.** 17 C.F.R. § 240.13D–101, Item 4, *as amended by* SEC Exchange Act Release No. 14692, 43 F.R. 18484 (April 28, 1978, effective May 30, 1978), [1978 Transfer Binder] CCH Fed.Sec.L. Rep. ¶ 81,571.

The person or corporation filing a Schedule 13D statement need not necessarily walk a tortuous path.

. . . Though the offeror has an obligation fairly to disclose its plans in the event of a takeover, it is not required to make predictions of future behavior, however tentatively phrased, which may cause the offeree or the public investor to rely on them unjustifiably. . . . Target companies must not be provided the opportunity to use the future plans provisions as a tool for dilatory litigation.

*Susquehanna Corporation v. Pan American Sulphur Company,* 423 F.2d 1075, 1085–86 (5th Cir. 1970) (tender offer context).

Defendants Becker and Clinique disclosed that they intended to acquire "a significant equity ownership position in the Company", that they intended to acquire additional shares on the open market or in privately negotiated transactions "if appropriate opportunities to do so are available", and that they intend to expend $7.5 million in such acquisitions. They also disclosed that these plans were subject to reconsideration in light of future developments (expressly including the attitude of Transcon's management and Board of Directors), other business opportunities open to each of them, developments in the business of each, general economic conditions and money and stock market conditions, and that they might in the future determine to invest more or less than the originally agreed to $7.5 million.

Becker and Clinique also disclosed the fact that they had discussed with Transcon management a possible acquisition of the company, and that such possibility had been rejected by the management. They disclosed that they have considered the possibility of seeking control of Transcon, and stated that at the time they purchased their shares, and at the time the Schedule 13D was filed, they had no plans to acquire control, to make a tender or exchange offer or to propose a merger or other form of business combination. Nor, they stated, did they have a plan to seek representation on the Transcon Board, although they disclosed that they might "seek to discuss the business and policies of the company with management from time to time."

■ Plaintiff asserts that these representations are misleading in a number of respects. First, plaintiff contends that the Schedule 13D fails to disclose that $7.5 million is sufficient to acquire "working control" of the company; plaintiff alleges that Rubenstein estimated, in 1975, that 25–30% of the shares would constitute "working control" and asserts that $7.5 million is sufficient to acquire 25%. Assuming that Rubenstein was correct in 1975 and that the same estimate would be accurate today, the evidence indicates that neither Becker nor Clinique were familiar with his 1975 memorandum or with his views, and disagrees with that opinion today. Moreover, the price at which an issuer's stock is selling is a matter of public information and we see no basis for holding that Section 13(d)(1) requires a party filing Schedule 13D to calculate the number of shares that a given sum of money will purchase, especially when that number will change from day to day and can be calculated by anyone interested in the information.

Secondly, plaintiff contends that Becker and Clinique do in fact intend to acquire control of Transcon, and that their Schedule 13D is misleading in disclaiming such an intent. In support of this contention, they refer to evidence indicating that Rubenstein and Wender have not held a high opinion of Transcon's management; that defendants Becker and Clinique have discussed acquiring more than 20% of the stock through private block purchases; and that they have arranged bank financing for purchases beyond $7.5 million. We conclude, however, that while Rubenstein and Wender have indeed thought Transcon's management could be better, they also believed that the company was profitable and could be even more profitable if management could be influenced to accept certain suggestions. We also find that defendants did not intend to acquire blocks of Transcon stock in addition to the 20% to be acquired, but as part of that total. Finally, we find that while

discussions had been held with banks concerning the earlier plan of a tender offer or negotiated acquisition, such financing was never arranged once it became clear that the acquisition would be an unfriendly one; financing was never arranged with respect to a minority investment.

In *Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Company, Inc.*, 476 F.2d 687 (2d Cir. 1973), the issue before the court was whether defendant's Schedule 13D, filed in the context of a tender offer, was misleading with respect to its plans to acquire control. The court considered a number of circumstances in determining whether defendant in fact intended to acquire control, among them the following: defendant's "well-established practice of eventually acquiring firms in which it initially purchased only a small percentage of the outstanding shares", the fact that its financial commitment to purchase plaintiff's shares "represents the largest single commitment in G&W's history", and the fact that Gulf & Western's management believed that plaintiff was "such an 'overpriced' and 'run-down' corporation . . that it could not possibly succeed as an 'investment'" and that in management's view "much of A&P's difficulty is attributable to its present management." On the basis of those facts, the court found that defendant did intend to acquire control of A&P's business.

In the case before us, the evidence indicates that Wender believed Transcon's management was "unimaginative" and could be improved. We do not find, however, that defendants believed Transcon to be an unsuitable investment vehicle. Nor is there any evidence that Becker or Clinique has a history of acquiring control of companies after an initial minority investment. To the contrary, the uncontradicted testimony of Wender is that Becker's investments are primarily minority positions.

■ In sum, we conclude that plaintiff has failed to demonstrate that the Schedule 13D was misleading with respect to defendants' plans to acquire control.

Plaintiff also alleges that defendants have plans to make certain changes in Transcon's management and in the company's policies and business. As plaintiff notes, however, any such alleged "detailed plans, of course, would be pure whimsy unless coupled, as they are, with plans to obtain control of Transcon." Pl. Post-Trial Memo. at 159. In light of our finding that defendants do not in fact have any present plans to take control of Transcon, we do have difficulty in attributing to them plans to change Transcon's management personnel or business practices. Nevertheless, we gather from the recent amendment to Item 4 of Schedule 13D that it is possible to have a plan or proposal which would result in a change in the issuer's management or business without having the purpose of acquiring control of the issuer.[16]

As evidence of defendants' plans to change Transcon's management, plaintiff argues first that, as defendants explain the term, "Omnicall" represents a well-developed mechanism for providing an incentive for management, and that given defendants' poor opinion of Transcon's present management, such an incentive could not be intended for Transcon's current management personnel, and must therefore be

---

**16.** The prior version of Item 4 read as follows: State the purpose or purposes of the purchase or proposed purchase of securities of the issuer. If the purpose or one of the purposes of the purchase or proposed purchase is to acquire control of the business of the issuer, describe any plans or proposals which the purchasers may have to liquidate the issuer, to sell its assets or to merge it with any other persons, or to make any other major change in its business or corporate structure . . . . . 17 C.F.R. § 240.13d–101 (1978).

As the SEC has explained, the recent amendment is intended to require disclosure of the purchaser's plans for the issuer whether or not the purchaser plans to acquire control of the issuer. SEC Exchange Act Release No. 14692, 43 F.R. 18484, 18493 (April 28, 1978), [1978 Transfer Binder] CCH Fed.Sec.L.Rep. ¶ 81,571. The recent amendment also expressly expanded the scope of disclosure required so as to include plans or proposals to make changes in the issuer's management or board of directors. *Id.*

meant for a new management group. Secondly, plaintiff notes that a number of internal Becker documents, including Rubenstein's Synectics Report, contain projections of Transcon's prospects under "new management". Finally, plaintiff notes several references to Rubenstein, alone or in conjunction with his "associates", as being involved in the future management of Transcon.

 We find, however, that while defendants planned to acquire Transcon during an earlier stage of their interest in the company, and planned to make management changes during that stage, the plans regarding management were put aside when the projected acquisition was abandoned. As we have already noted, defendants view Transcon's present management as "unimaginative" and "underachievers" whose performance can be improved. We find that as minority shareholders, however, defendants' plans regarding management consist of making suggestions and attempting to influence management to adopt policies that will improve Transcon's performance. Defendants' statements in their Schedule 13D do not misrepresent this intention.

## C. The Understanding with Rubenstein

Finally, plaintiff asserts that, regardless of whether nor not Rubenstein is a member of the "group", the Schedule 13D fails to disclose the truth regarding the understanding between Rubenstein, Becker and Clinique as to Transcon's stock. As we have discussed *supra,* Item 6 of the Schedule 13D requires that disclosure be made with respect to any "contracts, arrangements, understandings or relationships (legal or otherwise) with any person with respect to any securities of the issuer, including but not limited to transfer or voting of any of the securities, finder's fees, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss, or guaranties of profits or divisions of profits or loss, or the giving or withholding of proxies . . .". If any such arrangements exist, the details must be furnished.

There is such an arrangement between Becker, Clinique and Rubenstein, and it was included in the Schedule 13D and has been quoted in full *supra.* Plaintiff asserts that either Rubenstein (through Omni) has a "call" on Becker's Transcon shares, or that some other unspecified person has such a call, and that this arrangement should have been disclosed in the Schedule 13D. Plaintiff bases this contention on the use of the term "Omnicall" in a memorandum from Wender to Petschek dated October 16, 1978.

As we have already concluded, neither Rubenstein nor Omni has a call on Becker's Transcon stock. Nor does any other person. We therefore find no basis for holding that the Schedule 13D failed adequately to disclose all contracts, arrangements, understandings, or relationships between Becker, Clinique and any other persons.

## III. Defendants' Motion to Dismiss the Third and Fourth Claims of the Complaint

### A. The Third Claim of the Complaint

Defendants have moved pursuant to F.R. Civ.P. 12(b)(6) to dismiss plaintiff's third and fourth claims. The Third Claim of the Complaint alleges that defendants violated Regulations T and X, the margin regulations, 12 C.F.R. §§ 220.1 *et seq.* and 224.1 *et seq.,* promulgated by the Federal Reserve Board pursuant to Section 7 of the Securities and Exchange Act, 15 U.S.C. § 78g. Both regulations regulate the extension of credit by securities brokers and dealers. Regulation T prohibits a broker-dealer from extending credit to its customers for the purpose of purchasing or carrying securities, except for margin securities, and the amount of margin loans may not exceed a percentage of the market value of the securities as set by the Federal Reserve Board, which ceiling is currently 50%. Regulation X, promulgated pursuant to Section 7(f), prohibits the customer from receiving credit when the extension of credit would cause the creditor to violate Regulation T. Plaintiff asserts that Becker and Rubenstein are

in violation of these regulations by virtue of a scheme "whereby defendant Becker purchases and carries shares of Transcon, subject to the 'Omnicall', for the purpose of subsequently transferring such shares to Rubenstein (or Halcyon) without any present payment for such shares by Rubenstein."

Defendant seeks an order dismissing this claim on the basis that, first, no private right of action exists for alleged violations of the margin regulations, and second, that plaintiff lacks standing to assert such a private right of action.

▮ We have already held that Rubenstein does not have a call or any beneficial interest in the shares purchased by Becker. In light of that holding, we find that Becker has not extended credit to Rubenstein for the purpose of purchasing or carrying securities. Thus, assuming for the purposes of this decision that plaintiff can prevail on the issues of the existence of a right of action and of standing to assert such a right, we find no violation of the margin regulations by either Becker or Rubenstein.

### B. *The Fourth Claim of the Complaint*

In this claim, plaintiff asserts that Rubenstein has violated Section 5 of the Interstate Commerce Act, 49 U.S.C. § 5, and that the other defendants have aided and abetted Rubenstein in that violation, in that Rubenstein has "proposed" to acquire control of Transcon without first applying to the ICC for approval of such acquisition of control.

Defendant has moved to dismiss this claim on the basis that plaintiff has no private right of action under Section 5 (other than as a matter of judicial review of a decision of the ICC). Transcon's position is that it is not seeking a determination on the merits as to whether or not defendants have violated Section 5, but rather, an injunction barring defendants from acquiring additional shares of Transcon pending a review by the ICC of the legality of such acquisition, that this Court has jurisdiction to issue such an injunction and that Transcon has standing to seek that relief.

As plaintiff continues, however,

In the present case, this Court need not make any determination on the merits of the alleged violation of Section 5. If Rubenstein is not determined to be part of the group seeking to control Transcon within the meaning of Section 13(d)(5) [sic] of the Exchange Act, the inquiry is at an end.

Pl. Post-Trial Memo. at 193. In light of our holding that Rubenstein is not a member of the group, our inquiry is indeed at an end. Defendants' motion to dismiss this Claim is granted.

### CONCLUSION

In sum, we find that the Schedule 13D filed by defendants was adequate and that Rubenstein was under no obligation to file such a Schedule. Plaintiff's claims based upon the margin regulations and the Interstate Commerce Act are also without merit.

In so holding, we wish to note our opinion that defendants Becker and Clinique, doubtless carefully following the advice of sophisticated counsel, have so structured their relationship with Rubenstein that they have come as close as one can come to forming a "group" with him without actually doing so. They are, of course, free to so arrange their transactions, as long as they do not cross the line which has been established.

Plaintiff, on its part, has ably and exhaustively pursued every possible lead. It has left no stone unturned, no nuance unexplored. The burden of establishing, among other things, whether understandings, explicit or implicit, exist among persons whose other affairs are so closely interrelated is a difficult one. We commend plaintiff's counsel on their industry, skill and ingenuity. We have concluded, however, that plaintiff has failed to sustain its burden.

SETTLE ORDER.