**Felice ROSEN, Derivatively on Behalf of Egghead.Com, Inc., Plaintiff,**

**v.**

**BROOKHAVEN CAPITAL MANAGEMENT CO., LTD., Focused Capital Partners, L.P., Watershed Partners, L.P., Cadence Fund, L.P., Brookhaven Capital Management, LLC, Piton Partners, L.P., Skye Investment Advisors, LLC, Skye Investments, Inc., Vincent Carrino, Daniel Coleman, Paul McEntire, Robert Lishman, and Egghead.Com, Inc., Defendants.**

**No. 99 Civ. 9397 VM.**

United States District Court, S.D. New York.

Sept. 29, 2000.

---

Paul D. Wexler, Bragar, Wexler, Eagel & Morgenstern, L.L.P., New York City, for Felice Rosen, Derivatively on Behalf of Egghead.Com, Inc., plaintiff.

David M. Macfarlan, Harsham, PA, for Cadence Fund, L.P., defendants.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Felice Rosen ("Rosen") brings this action under Section 16(b) of the Securities Exchange Act of 1934 (the "Act") for disgorgement of short-swing profits allegedly obtained by defendants acting as a group in violation of that section of the Act. Before the Court is defendants' motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief can be granted. For the reasons set forth below, the Court denies the motion.

## BACKGROUND [1]

Rosen is a New York resident who owns the common stock of Egghead.Com, Inc. ("Egghead"). Egghead, a nominal defendant in this action, is a Washington corporation. Rosen brings this action derivatively on behalf of Egghead.

Defendants are Focused Capital Partners, L.P. ("FCP"), Watershed Partners, L.P. ("WP"), and Cadence Fund, L.P. ("CF"), all Delaware limited partnerships; Brookhaven Capital Management Co., Ltd. ("BCM"), a New York corporation and investment adviser to certain accounts, including FCP, WP and CF; Piton Partners, L.P. ("Piton"), a Delaware investment limited partnership; Brookhaven Capital Management, LLC ("LLC") and Skye Investment Advisors, LLC ("Skye"), limited liability companies, investment advisers, and Piton's two general partners; and Skye Investments, Inc. ("SII"), the manager and majority member of Skye.

The remaining defendants are four individuals. Vincent Carrino ("Carrino") is a general partner of FCP, CF and WP; the sole director and president of BCM; and the sole manager and majority member of LLC. Daniel Coleman is a general partner of FCP, CF and WP. Paul McEntire is chairman and managing director of Skye and chairman, director and chief executive officer of SII. Robert Lishman is a director of Skye (collectively, defendants referred to as "Brookhaven").

Rosen alleges that the twelve named defendants constitute a group (the "Group") as defined under Section 13(d) of the Act and for purposes of determining beneficial ownership under Securities and Exchange Commission ("SEC") Rule 16a–1(a)(1) and thus liability under Section 16(b) of the Act; that the Group, through the combined shares of its members, held a greater than 10% beneficial interest in Egghead; that the Group engaged in certain short-swing stock transactions within a six month period; that defendants are

liable for at least $7,000,000.00 in disgorgeable profits; and that no exemption from liability is available to defendants.

## DISCUSSION

### I. STANDARD OF REVIEW

In considering a Rule 12(b)(6) motion, the Court must accept Rosen's factual allegations as true and draw all reasonable inferences in her favor. *See Hamilton Chapter of Alpha Delta Phi, Inc. v. Hamilton College*, 128 F.3d 59 (2d Cir.1997). It is the Court's task to assess the legal sufficiency of the complaint and not to judge the credibility of the pleadings or to assess the weight of any evidence offered in support of the action. *See Cooper v. Parsky*, 140 F.3d 433 (2d Cir.1998). A claim may not be dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Morris v. Local 819, Int'l Bhd. of Teamsters*, 169 F.3d 782, 784 (2d Cir.1999) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

### II. THE ACT AND RELATED PROVISIONS

Under Section 16(b), directors, officers and beneficial owners of the equity shares of an issuer may not purchase and sell shares of that issuer within any period of less than six months. 15 U.S.C. § 78p(b). "Beneficial owner" is defined in Section 16(a) of the Act as a person who "directly or indirectly" owns more than ten percent of any equity security (other than exempted security) registered under § 12 of the Act. 15 U.S.C. § 78p(a). These insiders are presumed to possess or have access to non-public information about the issuer and thus to be able to take advantage of their position by trading in the issuer's securities based on private knowledge gained thereby.

To discourage insider transactions, the Act authorizes civil actions to be brought

1. The relevant facts are set forth in the complaint and are briefly repeated herein.

on behalf of the issuer by a qualified shareholder to compel disgorgement of short-swing profits. SEC Rule 16a–1(a)(1) provides that in the event two or more persons "act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding or disposing of securities of an issuer", such persons are deemed to be a "group", as defined in Section 13(d)(3) of the Act, for purposes of determining the group's beneficial ownership under Rule 16a–1(a)(1). 15 U.S.C. § 78m(d)(3); 17 C.F.R. § 240.16a–1(a)(1). If the aggregate number of shares of a particular issuer owned by the group exceeds ten percent, beneficial ownership exceeding ten percent is attributed to each member of the group. In that event, pursuant to Section 16a–1(a)(2), each member individually may be liable to disgorge impermissible short-term profits with respect to securities as to which the owner so deemed has or shares a direct or indirect pecuniary interest. 17 C.F.R. § 240.16a–1(a)(2).

Rule 16a–1(a)(1)(i) through (xi) enumerate eleven classes of institutions whose security holdings held in fiduciary or customer accounts maintained for the benefit of third parties in the ordinary course of business are exempt from the definition of beneficial ownership as long as the shares of the issuer in question are acquired by such institutions or persons "without the purpose or effect of changing or influencing control of the issuer". 17 C.F.R. § 240.16a–1(a)(1). Accordingly, shares of the issuer held by these institutions or persons are not counted for the purposes of calculating whether the ten percent threshold has been exceeded. The eleven categories are:

(i) a registered broker or dealer;

(ii) a bank;

(iii) an insurance company;

(iv) a registered investment company;

(v) a registered investment advisor;

(vi) an employee benefit plan subject to ERISA or maintained for the benefit of government employees, or an endowment fund;

(vii) a parent holding company or control person;

(viii) a savings association;

(ix) a religious institution plan;

(x) a group, provided that all the members of such group qualify as persons enumerated in subsections (i) through (ix) above; and

(xi) a group, provided that all the members of such group qualify as persons enumerated in subsections (i) through (vii) above.

17 C.F.R. § 240.16a–1(a)(1)(i)–(xi).

In adopting the Rule setting forth these exemptions, the SEC acknowledged that without such exemptions the listed institutions, which in the ordinary course of their business manage customer and fiduciary accounts, would be subject to liability under Section 16(b) if they exercised either their voting or investment power over accounts that when aggregated held over ten percent of a class of equity securities. *See* Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Release No. 34–27148, 54 Fed. Reg. 35667, at 35670 (Aug. 18, 1989) (the "1989 Ownership Reports"). Responding to this concern, the SEC stated that "[t]he proposed revision appears necessary to avoid undue interference with the day-to-day business of banks, brokers, dealers, investment advisers and other specified institutional fiduciaries and custodians." *Id.*

III. *RATIONALE OF THE SEC RULES*

The SEC Rules reflect the realities, practicalities and certain equitable considerations of securities transactions. The Act recognizes the reality that certain financial institutions hold and manage investment accounts for different purposes, in so doing performing different roles and

maintaining holdings that contain distinct classes of securities. In the ordinary course of business, these entities may acquire and hold securities of third parties in customer and fiduciary accounts entrusted to them. Or they may trade for their own accounts. The institutions may trade passively for investment purposes only, or actively, manifesting an intent or effect of engaging in the management or in influencing control over the management of the issuer. They may engage in these activities directly as owners of shares of the issuer, or indirectly by exercising the power over voting or investment of shares the institutions hold beneficially that are actually owned by other persons who authorize the exercise of such authority. Finally, stock transactions may be made by institutional investors individually or collectively through a group organized or acting for this purpose. In turn, such a group may hold shares under circumstances reflecting the various forms of ownership and purposes described above.

In defining beneficial ownership for the purposes of potential Section 16(b) liability, only certain securities from among those in the various forms of institutional holdings qualify to be counted towards the ten percent threshold. Others are exempt. The exceptions explicitly recognize commercial necessity and practicalities of not hampering the business activities of the specified institutional entities which on any given day may be custodians to shares in fiduciary or customer accounts exceeding the ten percent limit. Keeping track of such holdings for large numbers of investors would place undue administrative burden on these institutions. Implicit in the exemptions is also an equitable consideration: that it would be unfair to place Section 16(b)'s strict liability for disgorgement of short-term profits on certain passive investors who may possess no inside knowledge or purpose to engage in the management or to influence control of the issuer.

Accordingly, for the purposes of imposing liability, the SEC Rules strike a middle ground that gives expression to these practical and equitable concerns. The relevant inquiry entails identifying which equity securities, from among the shares of a given issuer in various institutional accounts, may be included in the calculation of the ten percent beneficial ownership. Under the Rules, the computation of securities of an issuer counted to define a beneficial owner subject to the ten percent threshold excludes stock of the issuer that the specified entities hold on behalf of third parties, but only to the extent that such shares are acquired and held truly passively, in other words, "without the purpose or effect of changing or influencing the control of the issuer." *See* 17 C.F.R. § 240.16a–1(a)(1).

The Act and the corresponding Rules may be construed to reflect two different concepts of a "group". Section 13(d)(3) provides that when two or more persons "act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection." 15 U.S.C. § 78m(d)(3).

In accordance with Section 13(d)(3), the corresponding SEC Rule provides:

> When two or more persons agree to act together for the purpose of acquiring, holding, voting or disposing of equity securities of an issuer, the group formed thereby shall be deemed to have acquired beneficial ownership, for purposes of Sections 13(d) and 13(g) of the Act, as of the date of such agreement, of all equity securities of that issuer beneficially owned by any such persons.

17 C.F.R. § 240.13d–5(b)(1).

Under the concept described by these provisions, the group comes about by virtue of a direct or indirect agreement by two or more persons to act together with respect to the shares of a particular issuer each member of the group beneficially

owns. Though the shares in fact are separately owned, they are aggregated and *deemed* to have been acquired by the group collectively for the purposes of Section 13(d) and 13(g) of the Act. The group then incurs obligations to publicly disclose its collective beneficial holdings of the given corporation.

Rules 16a–1(a)(1) and 16a–1(a)(2) import the Section 13(d) group concept and apply it for the purposes of *liability*. They impose Section 16(b) obligations on all members of the group whose aggregated shares of an issuer exceed the ten percent limitation, for the purpose of which each member of the group is deemed a beneficial owner of greater than ten percent of the issuer's stock. Rule 16a–1(a)(1)(x) introduces a concept of a group in another context, that of *exemption* from potential liability under Section 16(b). The exclusion applies to securities held for third parties or in customer or fiduciary accounts by "[a] group, provided that all the members are persons specified in § 240.16a–1(a)(1)(i) through (ix)".[2] A question here arises as to whether the group concept defined for the purposes of Section 13(d) reporting and Section 16(b) liability coincides with the reference to "group" for the purposes of exemption pursuant to Rule 16a–1(a)(1)(x).

## IV. *THE PARTIES' ARGUMENTS*

According to Rosen's theory, a group constituted or deemed so for the purposes of Sections 16 and 13(d)(3) and which includes an institution or person otherwise exempt under Rule 16a–1(a)(1)(i) through (ix), would lose the exemption in the event any member of the group is not "independently exempt" under any of these subsections. Compl., ¶ 19. Implicit in this argument is that application of the term "group" referred to in subsection (x) for exemption purposes corresponds to the same concept of group defined for the

purposes of public disclosure and liability. Consequently, unless all of the members of a group qualify as exempt institutions, each member would be deemed to own beneficially all of the securities owned in combination by all of the shareholders who comprise the group. Rosen contends that the subdivision (v) exclusion is limited to investment advisers acting independently. As a result, a registered adviser such as BCM whose beneficial holdings of a given issuer may qualify for an exemption under subsection (v), automatically loses the exemption and cannot qualify under subsection (x) if it becomes part of a group whose other members are not among those enumerated as eligible for exemption.

In that case, the adviser would be considered a member of a non-exempt group; the adviser's beneficial holdings in custodial accounts would be included in the beneficial ownership of the group for the purposes of the ten percent calculation; and the group then would be deemed beneficial owner of the shares held by all group members combined. Rosen, citing policy considerations, contends that it would be unfair to allow a small group of private investors to escape liability under Section 16(b) merely by interjecting an adviser to manage their investments.

Brookhaven counters that the group exemption under subsection (x) does not apply in this case and that its Egghead holdings in fiduciary and customer accounts do not count towards the ten percent beneficial ownership threshold because BCM is actually relying on the separate investment adviser exemption provided for under subsection (v). According to Brookhaven, a subsection (v) investment adviser exemption is not vitiated by subsection (x) merely because the adviser happens to be part of a group for Section 13(d) purposes. Brookhaven distinguishes between shares an adviser may hold as a passive investor for fiduciary accounts and those it may

---

**2.** Subsection (xi) contains an almost identical provision exempting a group comprised of members described in subsections (i) through

(vii). Because the text of the two subsections is otherwise identical, the discussion here will continue to refer to subsection (x) only.

hold for its own account, the latter, but not the former, counting towards the ten percent beneficial ownership threshold.

Under this argument, each of the nine separate exemptions enumerated in Rule 16a–1(a)(1) should be considered independently of one another notwithstanding the existence of a group, and an investment adviser therefore should not lose its exemption as to shares otherwise excludable from the definition of beneficial ownership when another exemption otherwise applicable, such as the group exemption, is not available. Accordingly, Brookhaven contends that the exemptions are not mutually exclusive, and the group exemption does not cancel the other individual exemptions.

Brookhaven suggests that the group exemption of subsection (x) should be read to apply to situations where the group *collectively* owns securities held for the benefit of third parties or in customer accounts in the ordinary course of business. In that event, since the same securities are owned in common by the group, it would make sense to require that each group member be separately exempt and to negate any other individual exemptions. Brookhaven further argues that if an investment adviser were to lose its exemption under subsection (v) whenever it becomes part of a group, such an exemption could never exist where the adviser has more than one client acquiring the securities of the same issuer. This result follows, according to Brookhaven, under an SEC opinion stating that investment companies with a common investment adviser who acquire securities of an issuer constitute a group for the purposes of Section 13(d). *See Stewart Fund Managers Limited,* 1974 SEC No–Act. LEXIS 526, at *2 (Aug. 9, 1974).

While the parties agree that the only case to date that has dealt with the issue before the Court is one recently decided in this District (*see Strauss v. Kopp Investment Advisors, Inc.,* No. 98 Civ. 7493, 1999 WL 787818 (S.D.N.Y. Sept. 30, 1999)), they disagree over the interpretation of Rules 16a–1(a)(1) and 16a–1(a)(2) contained in

that decision, and as to how much weight, if any, should be afforded to it. *Strauss* was a derivative action to recover short-swing profits under section 16(b) of the Act. Certain defendants argued that they did not qualify as beneficial owners of certain securities and were not liable because each of them qualified for exclusion from Section 16(b) liability under three Rule 16a–1(a)(1) exemptions: subsections (iv), (v) and (vii). *See id.* at *3. These defendants were allegedly part of a group with other unnamed defendants. *See id.*

The *Strauss* court, while noting that Section 16(b) "should be construed narrowly," nevertheless determined that Rule 16a–1(a)(1)(x) required that *each* member of the alleged group be a person or institution that qualifies for one of the exemptions or "the entire group loses the exemption." *See id.* The Court found that the "SEC clearly contemplated the impact of Section 13(d) groups within the Section 16(b) first-tier determination of beneficial ownership when it drafted the 1991 Rules, since in those Rules each member of a 'group' is required to also have a 'pecuniary interest' in the equity at issue before imposing short-swing liability." *Id.* Accordingly, the court held that the other defendants were not excluded under Rule 16a–1(a)(1) and that the entire group lost its exclusion. *See id.* This Court declines to follow the rationale of *Strauss.*

## V. ANALYSIS

The "beneficial owner" definition promulgated in Rule 16a–1(a)(1) provides that solely for the purposes of determining whether a person is a beneficial owner of more than ten percent of equity securities covered by the Act, the term "beneficial owner" is defined as any person who is so deemed pursuant to Section 13(d) of the Act. 17 C.F.R. § 240.16a–1(a)(1). Section 13(d)(3) codifies the "group" concept, extending the definition of "person" to any two or more persons or institutions who act as a group "for the purpose of acquiring, holding or disposing of securities of an

issuer". 15 U.S.C. § 78m(d)(3). By virtue of Rule 13d–5(b), groups so formed are deemed to possess beneficial ownership of all equity securities of the issuer beneficially owned by all the persons who form the group. 17 C.F.R. § 240.13d–5(b)(1).

Rule 16a–1(a)(1), however, circumscribes the scope of beneficial ownership covered. It does so by carving out an exclusion consisting of three interrelated components. First, the Rule limits coverage by type of investor. It exempts from application of the definition of beneficial owners nine categories of specifically enumerated institutions or persons. A second element of the exception is defined by type of ownership. It extends the Rule only to a particular class of securities held by exempt persons: those maintained for the benefit of third parties or in customer or fiduciary accounts in the ordinary course of business. The third dimension of the exclusion relates to the intent manifested by the eligible persons or institutions in acquiring the qualifying class of securities. The exemption from counting in the determination of a ten percent holder applies only so long as such securities are acquired by the exempt persons or institutions without the purpose or effect of changing or influencing control of the issuer or engaging in other impermissible arrangements.

In formulating these distinctions the SEC evinced concern that, absent an exception, institutions that in the ordinary course of business manage customer and fiduciary accounts would become subject to Section 16 obligations if they exercised voting or investment power over accounts that, when aggregated, held more than ten percent of a class of securities covered by the Act. *See* 1989 Ownership Reports, 54 Fed.Reg. at 35670. Responding to this concern, the SEC included in its Rule 16 amendments the exclusions specified, which were designed to "avoid undue interference with the day-to-day business of banks, brokers, dealers investment advis-

ers and other specified institutional fiduciaries and custodians." *Id.*

The Rule expresses the practical recognition that certain equity securities beneficially owned by the exempt institutions— those acquired and held with passive intent in the ordinary course of business—do not pose the insider trading harms the Act and related SEC Rules seek to address. These conditions build into the exemption their own prophylactic purpose, serving to "minimize the potential for the institutions to use the aggregated holdings to exert control and gain access to inside information." *Id.*

But the distinction gives clear expression to the converse as well: that if any of the three conditions justifying the exclusion are not satisfied, the institution and the shares in question fall within the definition of beneficial ownership and are counted toward the computation of ten percent holders. Thus, the SEC explicitly declared in adopting the final version of Rule 16a–1(a)(1), in an acknowledged "limited departure from the approach under Section 13(d)", that while shares held by exempt institutions in a fiduciary capacity in the ordinary course of business are not included for the purposes of determining ten percent holder status, "securities not held in a fiduciary capacity ... must be counted in determining whether the 13G institution is a ten percent holder". *See* Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Release No. 34–288869, 56 Fed. Reg. 7242, at 7244 (Feb. 8, 1991) (the "1991 Ownership Reports"). In a similar vein, the SEC specifically underscored the intent prerequisite, noting that "in order to qualify to use Schedule 13G, the institution must acquire or hold securities of the issuer in the ordinary course of business without the purpose or effect of influencing or changing control." *Id.* at 7245 n. 38.

This regulatory framework suggests a two-tier inquiry for determining beneficial ownership and the related ten percent holder status. The first step relates to the

ownership "person" for Section 13(d) purposes, and seeks to settle whether or not the person or institution is one eligible to claim any of the ten exemptions enumerated in Rule 16a–1(a)(1). The second step pertains to the securities in question and the circumstances under which they were acquired and held. If these tests satisfy the concerns that underlie the insider trading restrictions of the Act and Rules, the shares at issue should not count toward the ten percent holder limitation applicable to the person or institution involved. Under these circumstances, as the SEC acknowledged, an eligible institution could aggregate, in the ordinary course of business in customer and fiduciary accounts, shares of a particular issuer exceeding the ten percent bound that, but for the Rule 16a–1(a)(1) exemption, could subject the institution to liability under Section 16(b). *See* 1989 Ownership Reports, 54 Fed.Reg. at 35670.

The issue here in contention is whether these considerations and associated analysis differ when an institution, otherwise eligible for exemption under Rule 16a–1(a)(1), beneficially owns securities, acquired in the ordinary course of business and held in customer or fiduciary accounts, that by themselves do not exceed the ten percent holder mark, but that would cross the threshold if aggregated with shares of the same issuer owned directly or beneficially by persons who form a Section 13(d) group of which the purportedly exempt institution or person is a part and whose other members do not qualify for any of the Rule 16a–1(a)(1) exemptions. More specifically, would beneficial ownership of securities by an institution that otherwise would qualify for exemption from obligations under Section 16 of the Act nonetheless fall within the scope of the Act if the institution becomes part of a Section 13(d)(3) group that includes any non-exempt members?

Nothing precisely on point in the Act or related SEC Rules addresses this narrow question. For guidance, the Court must turn first to the language of the statute and corresponding Rules and to the regulatory intent conveyed in the SEC's explanatory notes. Despite the absence of clear text dispositive of the issue, several observations relating to the general intent of the statute and pertinent Rules, and to the conceptual approach proper in interpreting and applying them, may illuminate a path to a persuasive resolution of the issue.

Section 16 of the Act was enacted to serve a dual purpose. It operates to provide a source of information to the public about the securities transactions and ownership of the officers, directors and principal holders of covered issuers. By requiring these corporate insiders to report holdings of their corporation's shares, Congress sought not only to codify and promote compliance with fiduciary standards, but to offer public investors the safeguard of information about the soundness of the corporation's securities as reflected by transactions involving the issuer's own managers and primary shareholders. Secondly, in order to curb abuse by such insiders taking advantage of their positions in order to unfairly use non-public information to profit from their privileged relationship to the corporation, Section 16(b) sought to remove the incentive and opportunity for insider trading. That provision authorizes private actions derivatively on behalf of the corporation to permit recovery of profits garnered by insider purchases and sales of the issuer's shares within any given six-month period. The Section 16(b) liability being strict, it applies whether or not the corporate insiders actually possessed material, non-public information. *See* 1989 Ownership Reports, 54 Fed.Reg. at 35668.

As an initial matter, in construing Section 16 of the Act and Rules, it is essential to consider the question in the light of the Second Circuit's relevant instruction. In this connection, the Court of Appeals has declared:

The statute, as written, establishes strict liability for all transactions that meet its mechanical requirements. When courts have looked to the policy, it was to avoid the sometimes harsh results of this inflexible rule. . . . Thus, the policy arguments . . . constitute a rule of exclusion from liability, not a rule of inclusion. *Gwozdzinsky v. Zell/Chilmark Fund, L.P.,* 156 F.3d 305, 310 (2d Cir.1998). *See also Foremost–McKesson, Inc. v. Provident Secs. Co.,* 423 U.S. 232, 251, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976) (noting that because Section 16(b) imposes strict liability it should be narrowly construed).

First, the Court takes note of the circumstances that prompted the revisions to Rule 16a–1(a)(1) and the SEC's purposes in promulgating the pertinent amendments. The SEC Release accompanying the final Rules declares:

> Noting that the regulatory framework had resulted in interpretive uncertainty, substantial litigation, and, in some instances, unnecessary regulatory burdens, the Commission proposed to revise the rules to achieve greater clarity, rescind unnecessary requirements, streamline mandated procedures, increase compliance with the reporting provisions of the rules, and enhance consistency with the statutory purposes of section 16.

1991 Ownership Reports, 56 Fed.Reg. at 7243.

The Court believes that these regulatory ends are better served by an interpretation of Rule 16a–1(a)(1) that facilitates, simplifies and encourages compliance with the Rule, rather than by a reading that may produce the opposite effects by unwarrantly expanding potential Section 16(b) liability. Under this approach, the Rule on its face and the accompanying regulatory history recognize that not every trade by an insider presents harms to the securities market and the potential for abuse that Congress sought to deter by curbing insider trading. Rather, under proper safeguards, certain transactions involving certain institutions and persons need not be enmeshed within the rigid net of Section 16(b) liability. To this end, Rule 16a–1(a)(1) clearly expresses an intent to exclude certain institutions and persons as well as a particular class of securities held by them from counting towards the ten percent holder threshold.

The regulatory design erects a complex scheme that reflects an interrelationship among the three factors identified above: the securities holding entity, the form of ownership of the given shares and the holder's intent in acquiring them. All three elements appear essential to the proper construction and application of the Rule. Thus, the analysis upon which a determination under the Rule is grounded must take into account the interplay of all three prerequisites. In this context, a number of relevant variables necessarily come into play, giving rise to multiple possibilities affecting the potential Section 16 obligations of exemption-eligible institutions or persons. A first set of variables pertain to a single exemption-eligible institution or person and:

1. securities beneficially held in fiduciary accounts in the ordinary course of business, with no purpose or effect to influence control of the issuer;

2. securities beneficially held in fiduciary account in the ordinary course of business, with purpose or effect to influence control of the issuer;

3. securities directly held for the owner's account, with or without intent to influence control; and

4. securities held in both forms of ownership, some beneficially in fiduciary accounts in the ordinary course of business, and others directly in the owner's account, in each case with or without manifesting the requisite intent element.

Under these variables, Rule 16a–1(a)(1) contemplates that distinct consequences would follow. No Section 16 obligations as a ten percent beneficial owner would be

associated with prospect 1. Equity securities of any class of a given issuer beneficially held by the institution or person would not count towards the determination of ten percent holder status even if numerically the actual number of such shares so owned would exceed that proportion of the class of stock. But the Rule would embrace and potentially subject to Section 16(b) exposure transactions falling within the scope of prospects 2 and 3. Correspondingly, liability would attach under prospect 4 with respect to transactions in some shares but not others.

A second set of Rule 16a–1(a)(1) variables would introduce the Section 13(d)(3) group concept and substitute it for ownership by a single entity as assumed above. Two possibilities arise in this respect: a group comprised only of two or more exemption-eligible institutions or persons listed in Rule 16a–1(a)(1)(i) through (ix); and a group consisting of one or more such potentially exempt institutions or persons acting in concert with other investors not so qualified. With regard to the former, what would emerge from combining the shareholder component with the elements of form of ownership and intent of acquisition should produce variable Section 16 consequences paralleling those associated with the single entity analysis described above. Notably, under this postulation, potential obligations under Section 16(b) would attach to the group under prospects 2, 3 and 4, notwithstanding that the group would encompass only exemption-eligible shareholders. In other words, no automatic exemption attaches by reason of the status of the holders as a Section 13(d) group or of their eligibility for exemption pursuant to Rule 16a–1(a)(1).

The next group possibility, which reflects the issue before this Court, entails examination of the consequences of securities ownership by a mixed group. Consistent with the reasoning articulated above, as regards such a group, the same potential liability results should obtain fully with respect to prospects 2 and 3, and, as to

directly-owned shares, to 4. The shares in question would count towards the determination of ten percent holder status despite that portions of them may be owned, whether directly or beneficially, by an exemption-eligible entity. Section 16 obligations and potential liability would pertain in either case. This winnowing leaves for consideration the issue at hand: the treatment of the shares owned beneficially in fiduciary or customer accounts in the ordinary course of business by an exemption-eligible institution member of a mixed group, assuming for this discussion that the institution's such securities were purportedly acquired without the impermissible purpose or effect.

As a starting point for its consideration of this issue, the Court returns to a point earlier alluded to that emerges from the Rule 16a–1(a)(1) schematic detailed above. The regulatory design the Rule articulates apparently envisions that the various components of the rule work in tandem. In other words, in the context of ownership of securities by a group, no single factor by itself is categorically controlling of the determination of beneficial ownership for ten percent holder purposes. Rather, what come across as the most essential common denominator yielding Section 16 obligations is the interlocking combination of type of shareholder and the form of ownership of equity shares covered by the Act— whether by potentially exempt or non-exempt investors, whether directly or beneficially, whether by a single entity or by a group—when such securities are not acquired in the ordinary course of business in fiduciary or customer accounts, or without purpose or effect to influence control of the issuer.

In this light, once the eligible institutions and the securities qualifying for exclusion from beneficial ownership have been determined to satisfy the conditions that the Act and related Rules seek to achieve, it serves little legislative or regulatory purpose to vitiate an institutional exemption and require the same shares to

count for ten percent holder analysis in the event the institution chooses to combine its own non-exempt equity security interests as part of a group that includes non-exempt members and shares. Such a requirement would run counter to the purposes the SEC articulated in responding to the institutional concerns that persuaded it that the Rule 16a–1(a)(1) exemptions were necessary in the first place in order "to avoid undue interference with the day-to-day business" of the specified institutional fiduciaries and custodians *See* 1989 Ownership Reports, 54 Fed.Reg. at 35670.

A construction of the Rule that would recognize the exemption for certain securities of these persons if acting independently, but not if they are members of a group formed to act in regards to non-exempt shares, would serve only to place an unnecessary burden on the institutions. The more compelling inquiry in this connection is not whether the institution is acting as part of a group, but how the equity shares in question were acquired and held; more specifically, whether their beneficial ownership by the institution occurred in the ordinary course of business in customer or fiduciary accounts for passive investment objections, and without purpose or effect to influence control over of the issuer. If so, these conditions of themselves, as the SEC Release acknowledged, "should minimize the potential for the institutions to use the aggregated holdings to exert control and gain access to inside information". 1989 Ownership Reports, 54 Fed.Reg. at 35670.

In this Courts' view, this deterring element exists to no lesser degree whether the institution beneficially holds such shares independently on behalf of one or multiple clients, or as part of a group whose holdings encompass non-exempt holdings. On the other hand, to nullify the exemption because the institution becomes a member of a group, and in that event to count the same shares towards the ten percent holder threshold, serves no additional deterrent purpose while subjecting the institution to the type of administrative burden and potential Section 16(b) exposure that the institutional exemption was intended to avert. For example, an exempt institution which alone may beneficially hold shares of an issuer numerically exceeding the ten percent mark but excluded from beneficial ownership by operation of a Rule 16a–1(a)(1) exemption, would lose the protection of the exclusion of those shares and subject itself to liability, if it became a member of a group whose other shares may not exceed the ten percent threshold. Such a reading and application of the Act would have the effect of expanding rather than narrowing the scope of Section 16(b)'s strict liability, contrary to the rule of construction ordained by *Gwozdzinsky* and related doctrine.

Second, an interpretation of Rule 16a–1(a)(1) that would recognize a listed exemption with respect to the same equity shares when the institution acts independently, but annul it if the institution is part of a group, would read into the regulation an internal contradiction for which no basis exists in the language of the rule, its regulatory purpose or public policy. As a general principle of statutory construction, an interpretation that produces such inconsistencies or that works to negate legislative intent must be avoided. *See Trichilo v. Secretary of Health & Human Servs.*, 823 F.2d 702, 706 (2d Cir.1987).

▆▆▆ Third, absent unequivocal language or legislative intent to the contrary, every provision of a statute or regulation is presumed to have separate meaning; no part may be deemed surplusage. *See Bell v. Reno*, 218 F.3d 86 (2d Cir.2000). Consequently, the most appropriate approach to construing two provisions of a statute or regulation that may appear at odds is not to allow one provision to invalidate another, but to find a rational reading that gives expression to the fullest application of the Rule as a whole and enables the reasonable coexistence and application of the seemingly clashing provisions. *See Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.,*

186 F.3d 210, 217 (2d Cir.1999). It remains for the Court therefore to seek to reconcile the apparently conflicting effects of the Rule 16a–1(a)(1)(x) "group" exemption in relation to the various separate exemptions the Rule accords to individual institutions. Such harmonization is achievable in the case at bar.

 As a point of departure, the Court notes that Rule 16a–1(a)(1) imports Section 13(d) analysis into the ten percent holder determination for Section 16 purposes. *See* 1991 Ownership Reports, 1991 Ownership Reports, 56 Fed.Reg. at 7244. But, as the SEC explanatory comment observes, the Section 13(d) definition of beneficial ownership "is used *only* to determine status as a ten percent holder". *See id.* (emphasis added). Under the two-prong test the Rule suggests, the inquiry begins with an application of the definition of beneficial ownership solely to determine whether a particular person is a ten percent holder and therefore subject to Section 16 obligations. *See* 1989 Ownership Reports, 54 Fed.Reg. at 35670–71. Once the insider determination has been made, the second beneficial ownership definition analysis, the pecuniary interest test, would apply to identify both which transactions and holdings require reporting pursuant to Section 16(a) and which may be subject to Section 16(b)'s short-swing profit liability. *See id.*

Conducted under the approach described here, the Section 13(d) beneficial ownership analysis as applied for the purposes of Rule 16a–1(a)(1) would first consider the ten percent holder status, whether relating to any individual owner or to a qualifying group. Under this application, shares held by eligible institutions that qualify for exclusion are not counted for the purposes of determining ten percent holder status, although securities not held in an exempt capacity—for example, those acquired for the institution's own account—must be counted. *See* 1991 Ownership Reports, 56 Fed.Reg. at 7253–54.

The analysis here described should obtain, as indicated above, whether the institution's ownership interests in excludable securities are independently held or maintained as part of a group. In other words, this approach suggests that the ten percent holder determination deriving from Section 13(d) analysis should stand alone, and not be affected by or require any further independent inquiry related to the exemption provisions of Rule 16a–1(a)(1). Accordingly, for example, upon a finding of which shares held by the members of a Section 13(d)(3) group are exempt and which count towards the ten percent computation, no additional application of the Rule 16a–1(a)(1) group exemption concept should apply to void the beneficial ownership determination so achieved as to the shares eligible for exclusion. Perhaps this is the meaning intended by the SEC Release where it notes: "In contrast to section 13(d), which requires a group filing, the group itself would not be a separate person for section 16 purposes." 1991 Ownership Reports, 56 Fed.Reg. at 7245 n. 54. It is largely on this point that this Court departs from the analysis and holding in *Strauss.* For there the Court apparently gave significant weight to a note in the 1989 Ownership Reports which states that: "[F]or purposes of determining status as a ten percent holder under Section 16, the securities beneficially owned by the group must be included in the calculation by each individual member of the group." *See id.* The *Strauss* court's analysis, however, does not indicate which securities are in fact beneficially owned by the group, nor does it distinguish between shares which count and those which qualify for exclusion from the calculation of beneficial ownership.

Under this construction, the reference to "group" in Rule 16a–1(a)(1)(x) would not acquire any independent meaning that would demand an analysis separate from that performed for the Section 13(d) ten percent holder status determination and that may have the effect, as Rosen's theory suggests, of negating the result obtained

from the initial application of Section 13(d). In that event, the "group" exemption provided for in subsection (x) may co-exist and complement the other individual exemptions the Rule also recognizes, insofar as the shares in question otherwise qualify for exclusion.

The "group" exception, available under subsection (x) when all the members of the group similarly qualify for exemption under Rule 16a–1(a)(1)(i) through (x), would thus apply in the same manner that it operates in the case of the holdings of separately exempt single institutions or persons. Where two or more such shareholders combine to act as a Section 13(d) group, the subsection (x) exemption would exclude from the calculation of beneficial ownership and from obligation under Section 16 all shares of the given issuer acquired and custodially held by members of the group in the ordinary course of business without intent to influence control over the issuer.

Conversely, under this reading, such a group would not be eligible for exemption, notwithstanding that all the members otherwise may be exempt institutions, if the aggregate of shares of the issuer it holds for its own account, or beneficially with the disqualifying purpose or effect of control of the issuer, exceeds the ten percent holder threshold. *See* 1989 Ownership Reports, 54 Fed.Reg. at 35670 (the proposed Rule 16a–1(a)(1)) "would exclude from the calculation of beneficial ownership of a 13G Institution those securities held in or for customer accounts in the ordinary course of business where the 13G Institution is a passive investor. If the 13G Institution also held securities of the same class in another capacity, those securities would be counted for purposes of determining the ten percent holder status." Finally, this reconciliation of the apparent conflict in Rule 16a–1(a)(1)(i) through (x) would deny exemption to a group, like that of BCM, constituted of exempt and non-exempt members, in cases where any non-qualifying shares held by the exempt institution,

when aggregated with all securities of the given issuer owned by all non-exempt members, exceeds the ten percent holder limitation.

The interpretive approach Rosen advances has the effect of initiating the beneficial owner inquiry not with the Section 13(d) analysis of whether a particular institution or group qualifies as a ten percent holder. Rather, it reverses the process by first applying Rule 16a–1(a)(1)(x) in a threshold determination whether all of the members of the purported group are eligible institutions enumerated in subsections (i) through (ix). If not, according to Rosen's hypothesis, the analysis ends. Any otherwise applicable exemptions are then unavailing and the shares beneficially held by the institution, even if not counted where the institution acted independently, would be included in the ten percent holder calculation.

Such reversal of the analysis inevitably yields the outcome of by-passing or cutting short the necessary Section 13(d) analysis of beneficial owner for ten percent holder purpose. This approach also places categorical focus on a single element of the analysis—the type of holder—to the exclusion of examination into the other two prerequisites delineated in Rule 16a–1(a)(1): form of ownership of the given class of shares and the basis and purpose with which they were acquired.

Finally, Rosen's theory raises some equitable concerns, alluded to by Brookhaven, in cases where investment advisers or broker dealers may hold shares of the same issuer both for their own account and in customer or fiduciary accounts whose owners have not authorized the exercise of beneficial ownership over their shares for the purposes of controlling or influencing management. These passive owners could be deprived of potential profits earned by sale of their shares if their holdings were automatically treated in combination with securities owned by the adviser or broker that do not qualify for exemption.

For these reasons, this Court declines to follow the holding and rationale of *Strauss.* Instead, the Court finds that the investment adviser exemption provided for under subsection (v) is not vitiated by subsection (x) because the adviser may· be part of a group for Section 13(d) purposes.[3] Accordingly, the Court now turns to the remaining open question, whether defendants are eligible for an exemption, or whether they acquired securities with the purpose or effect of changing or influencing control of Egghead or engaging in any other impermissible arrangements.

## VI. PURPOSE OR EFFECT OF CHANGING OR INFLUENCING CONTROL OF EGGHEAD

Rosen argues that the Rule 16a–1(a)(1)(v) exemption from the beneficial ownership definition for shares held by a registered investment adviser for the benefit of its customers is not available to Brookhaven because "their [November 13, 1998] 13D filing admit their *intent* to change or influence" (Compl., ¶ 17 (emphasis added)) and that the language of defendants' 13D filing "evidences a clear intent to influence control." *See* Plaintiff's Memorandum of Law in Opposition to Motion to Dismiss, dated Jan. 27, 2000, at 22.

Rosen claims that the following portion of Brookhaven's 13D filing evidences an intent to change or influence control:

> The persons named in Item 2 of this statement intend to communicate directly with EI's [Egghead] management regarding its financial condition, management and business plan, with a view to formulating suggestions for improvement, and may seek to be included in the present board of directors of EI. Such persons are also considering other ways to support and improve EI's business operations. Such persons may acquire additional shares of Stock at any

time or may dispose of part or all of their Stock at any time. Such persons currently do not otherwise have any specific plans or proposals regarding these matters.

Compl., ¶ 17. Rosen further argues that the group's actions had "the *effect* of influencing control of Egghead" in connection with the September 1998 election of three new directors to the Egghead eight-member board and the substantial reorganization of Egghead's distribution structure. Compl., ¶ 18 (emphasis added).

In support of their motion, Brookhaven claims that "[n]othing in any of defendants' 13D filing can be construed as such an admission" (Defendants' Memorandum of Law in Support of Motion to Dismiss, dated Dec. 8, 1999 ("Defendants' Memo"), at 3); that a plain and complete reading of Item 4 of their 13D filing, including subsections (a) through (i) shows no intent to change or influence control (*id.* at 3, 7–8; Eisenberger Declaration, sworn to Dec. 8, 1999 ("Eisenberger Decl."), Ex. B); and that the securities "were being purchased for investment purposes only." *Id.* at 3. Brookhaven also questions Rosen's chronology, noting that Rosen relies on the November 13, 1998 13D filing to support her claim that Brookhaven intended to influence Egghead and then refers to the September 2, 1998 election of directors to demonstrate that Brookhaven actually influenced Egghead. *See* Defendants' Memo at 9.

Brookhaven further contends that the election of the three directors "has nothing to do with anything the defendants said or did" because the directors were nominated by Egghead's management (*see* Defendants' Memo at 3, 8); the solicitation for the election of the three directors was made by a July 30, 1998 Definitive Proxy Statement filed by Egghead (*see* Defendants' Memo at 8, 16; Eisenberger Decl.,

---

**3.** Brookhaven has also argued that defendant Carrino is exempt under Rule 16a–1(a)(1)(vii) as a "control person" of BCM. *See* Defendants' Memo at 4, 22–23. Given the Court's

conclusion as to subsection (v) and the issue of intent (*see infra*), the Court declines to address at the present time Brookhaven's subsection (vii) argument.

Ex. D); the directors are identified in Egghead's September 2, 1998 Form 8–K (*see* Defendants' Memo at 8; Eisenberger Decl., Ex. C); the directors were not sponsored or promoted by any Group member (*see* Defendants' Memo at 3, 8, 16); and no other candidates ran against these three individuals. *See id.* at 3. Brookhaven claims that Rosen's allegations concerning this issue are conclusory and legally deficient. *See* Defendants' Memo at 4, 16.

In additional support of their motion, Brookhaven argues that "as a matter of law the language used in Item 4 of the Schedule 13D does not amount to an expression of intent to change or influence control" because in other cases similar language has been found insufficient to establish the requisite influence. *See* Defendants' Memo at 12–15; Defendants' Reply Memorandum in Further Support of Motion to Dismiss, dated Feb. 29, 1999, at 9–10. Brookhaven relies on *Azurite Corp. Ltd. v. Amster & Co.*, 52 F.3d 15 (2d Cir.1995); *Todd Shipyards Corp. v. Madison Fund, Inc.*, 547 F.Supp. 1383 (S.D.N.Y.1982); and *Transcon Lines v. A.G. Becker, Inc.*, 470 F.Supp. 356 (S.D.N.Y.1979).

The question here is whether Brookhaven's 13D filing and actions indicate a purpose or effect to change or influence control of Egghead. Schedule 13D, promulgated by the SEC as the means by which disclosure satisfying Section 13(d) of the Act is to be reported, requires the filer to (1) state the purpose of the acquisition of the covered securities, including any purpose to acquire control and (2) certain specifically listed "plans or proposals" which relate to or would result in (a) the acquisition or disposition of additional shares; (b) any change in the board of directors or management; or (c) any material change in the business or corporate structure of the issuer. 17 C.F.R. § 240.13d–101.

Case law in this Circuit offers guidance in defining the requisite intent encompassed by Section 13(d) and the corre-

sponding SEC Schedule 13D. The Second Circuit has stated that a control purpose includes any intention to acquire control and that "[s]uch an intention is a determination made with an element of resolve." *Azurite*, 52 F.3d at 18. That Court has also construed a "plan" as "something more definite than vaguely formed thoughts for the future." *Id.*

In articulating these standards, imprecise though they seem, the Circuit Court has acknowledged the difficulty posed by the reporting requirement, both to the shareholder formulating the Schedule 13D disclosure statement, and to a court reviewing its legal sufficiency. "It would be as serious an infringement of these regulations to overstate the definiteness of the plans as to understate them." *Electronic Specialty Co. v. International Controls Corp.*, 409 F.2d 937, 948 (2d Cir.1969). Implicitly recognizing that the fine calibration between too much and not enough disclosure cannot ignore commercial realities and practicalities, the Second Circuit has defined the proper point of equilibrium: "unless a course of action is decided upon or intended, it need not be disclosed as a plan or proposal under Item 4." *Azurite*, 52 F.3d at 18. Thus, disclosure is required of definite intentions and matters fully determined, and not predictions of future behavior, or of tentative or inchoate plans. *See Todd*, 547 F.Supp. at 1387; *Transcon*, 470 F.Supp. 356.

*Todd* is particularly instructive here because the Schedule 13D statements there parallel those at issue before this Court. Defendants in that case had expressly disclosed that they had acquired securities of the issuer to establish an equity position; that in doing so they were acting in concert; that as of the time of the filing their aggregate holdings in the issuer amounted to 8.87% of its outstanding common stock and that they intended to purchase up to 30%; that they had no plans to merge, reorganize or liquidate the issuer, to sell or transfer its assets in material amounts or to change materially the issuer's capitaliza-

tion, dividend policy or its business or corporate structure. *See Todd,* 547 F.Supp. at 1385–86.

The *Todd* defendants further stated that while they had no specific plans, recommendations or proposals regarding the future conduct of the issuer's business, they did intend to discuss with its management ways in which the issuer's liquid assets and cash flows not directly required for the issuer's current business operations may be deployed. *See id.* at 1386. Finally, defendants in *Todd* expressly denied any plans to seek majority representation on the issuer's board of directors. *See id.* They indicated, however, that they might seek to appoint one or more nominees to serve as directors and that they intended to support current management in the operation of the business. *See id.* The *Todd* court found that the purposes and intent of the defendants' transaction were fairly disclosed in all material respects and that there was no evidence that defendants had any purposes or plans with respect to the issuer other than that disclosed in their Schedule 13D. *See id.* at 1388.

Despite similarities in the Schedule 13D disclosure language, however, *Todd,* and the other cases on which Brookhaven relies are distinguishable from the action before this Court in one critical respect. Each of those cases was decided after extensive discovery, either at the stage of a motion for summary judgement or at trial. Brookhaven has not cited any case in which a court, upon a motion to dismiss, granted relief finding that, as a matter of law, a particular form of disclosure was sufficient on its face to satisfy the filing requirement of Schedule 13D.

This Court is mindful of the dilemma that the parties' contentions here raise at this early stage of court proceedings arising under the disclosure mandate of Section 13(d). On one hand, defendants, such Brookhaven here, seek a measure of certainty in some standards defining a minimal acceptable level of detail governing shareholdings, in order to offer filers some assurance that the information they publicly report will be sufficient to withstand legal challenge. From this perspective, as Brookhaven here contends, a filing that on its face provides unequivocal disclosure of no purpose or effect in defendants' acquisition of given securities to control management of the issuer should serve, as a matter of law, as a shield against frivolous or harassing litigation. Otherwise, not giving recognition to such disclaimers would work as an open invitation to any plaintiff to challenge any group disclosure. By virtue of mere unfounded assertions that the group's acquisitions of the shares in question were made with the impermissible intent of influencing the control of management, plaintiffs might be given a license for fishing expeditions, enabling them to explore whether through discovery, costly and inconvenient to the filer, they could turn up something to substantiate their charges.

On the other hand, matters of true plan, purpose or motive are not always palpable from mere words written on a disclosure statement. While emotions sometimes may be worn on a sleeve, intent, though a state of mind, is seldom published on the forehead. What a person harbors in the innermost privacy of thought may not always be discernible from uncontextual words, nor fully apparent from what a person chooses selectively to reveal on paper. The individual who may entertain an impermissible purpose, even if inchoate, is unlikely to flash it to the world in a public filing. Thus, to rely too rigidly on prefixed talismanic formulations may sanction a means by which filers may conceal true motive.

Accepting such formulaic disclosures without further inquiry as sufficient as a matter of law to satisfy Section 13(d) reporting requirements may defeat Section 16's purpose in authorizing derivative actions, for such a rule would deprive plaintiffs prematurely plaintiffs of a meaningful opportunity to delve into real intent that may lie behind the formation of stock ac-

quisition groups and to challenge questionable purchases of securities by insiders. This potential may yield unjust results, particularly in situations such as those present in the instant case, where the defendants constituting the group are both multiple and interlocked in an intricate mesh of numerous financial, legal and personal relationships whose actual ties, plans and proposals may be recorded in communications not adequately reflected in their Schedule 13D.

Matters of group purpose are even more difficult to discern, for intent may not always be fully formed, but may mature and manifest at any point in a continuum. Nor do all members of a group always think in sync or march lockstep. To grant defendants a Rule 12(b)(6) motion to dismiss and thereby to curtail inquiry by a derivative plaintiff before meaningful discovery has occurred regarding a Schedule 13D group filer's true plans and purpose as to a given stock acquisition, could create a safe haven for groups to conceal their real purposes behind formulaic terms.

Somewhere at the intersection of the competing interests and concerns is the point of resolution at which this matter may be decided. The Court concludes that, based on the present record, it is unable to determine Brookhaven's full intent or motivation at the time the Group filed its November 13, 1998 Schedule 13D. In addition, the Court believes that each of the three cases upon which Brookhaven relies is distinguishable based on the preliminary stage of this case and the fact that those cases involve court determinations of intent and motivation made after the fruits of substantial discovery and/or trial.

In *Transcon*, 470 F.Supp. at 378, Judge Sand concluded, after discovery and a bench trial, that "defendants do not in fact have any present plans to take control of Transcon." In *Azurite*, 52 F.3d at 19, the Second Circuit held that the evidence in the record which was "based on extensive discovery" was insufficient as a matter of law to prove that an intent to acquire control had been formed before it was disclosed. Finally, the court in *Todd*, 547 F.Supp. at 1386–87, considered "whether the Schedule 13D was deficient in its statement of the purpose and intent of the defendants" and held that plaintiff had "failed to prove by a preponderance of the credible evidence ... that all the purposes of the transactions of the Fund and Schwartz and their intent were not fully and fairly disclosed." Judge Pollack made specific findings and conclusions only after discovery and a bench trial including, but not limited to, that defendants had "no purpose or plans" concerning plaintiff-company or their investment in the company other than as described in their 13D filing; that defendants "only have an intent" to obtain an equity position to the extent disclosed; that defendants "did not have the desire to influence" the company's operations; that "no inference of any intent to control" is possible; and that there was no evidence that defendants "intended to force" the company to use its assets in an adverse manner. *See id.* at 1388.

In the case at hand, Brookhaven's purpose and intent may not be divined without some investigation and discovery. The Court finds it "difficult to judge intentions, and impossible to read defendants' minds." *See Standard Financial Inc. v. LaSalle/Kross Partners, L.P.,* No. 96 Civ. 8037, 1997 WL 80946, at *6 (N.D.Ill. Feb. 20, 1997). Here, according to defendants' Schedule 13D dated May 20, 1997, Brookhaven comprised a group well before the election of the three new Egghead directors, from as early as March 17, 1997 through the time of their first and second amendments to their Schedule 13D, dated November 26, 1997 and December 8, 1997, respectively. *See* Eisenberger Aff., Exs. E. Given such status, and drawing inferences in Rosen's favor as the Court is required to do on the present motion, Brookhaven may very well have been involved in or may have influenced the sub-

stantial reorganization of Egghead's distribution structure.

The Court therefore finds that discovery is appropriate to determine, among other things, whether Brookhaven's actions indicate more than an investment intent; whether Brookhaven intended to change or influence control; whether the securities were purchased, as defendants alleged, for investment purposes only; the extent, if any, to which Brookhaven may have been involved with the substantial reorganization of Egghead's distribution structure (an issue raised by paragraph 18 of the complaint and not addressed by defendants); the extent, if any, to which Brookhaven was involved with or influenced the election of the three board members given Brookhaven's holdings and role as a Group; and the extent, if any, to which Brookhaven failed to disclose information regarding current or future plans that were fixed, definite and certain, as opposed to preliminary, exploratory, tentative or contingent in nature.

## CONCLUSION AND ORDER

For the foregoing reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss is denied; and it is further

**ORDERED** that the parties are directed to appear for a conference with the Court on October 16, 2000 at 11:15 a.m. at the United States Courthouse, 40 Centre Street, Courtroom 219, New York, New York.

**SO ORDERED.**